In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 16-2860 & 16-3525

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JOSEPH FAULKNER and OTIS SYKES,

*Defendants-Appellants*.

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 13-CR-772-2 & 13-CR-772-18 — **Elaine E. Bucklo**, *Judge*.

_____

ARGUED JANUARY 11, 2018 — DECIDED MARCH 19, 2018

_____

Before EASTERBROOK and BARRETT, *Circuit Judges*, and
STADTMUELLER, *District Judge*.[*]

STADTMUELLER, *District Judge*. Joseph Faulkner and Otis
Sykes were convicted of conspiring to sell heroin at a place
called the Keystone, an open-air drug market on Chicago's
west side. Faulkner was a leader of the gang which ran the

_____

[*] Of the Eastern District of Wisconsin, sitting by designation.

market and Sykes was a low-level street dealer. In this consolidated appeal, Faulkner challenges numerous aspects of his conviction, while Sykes takes issue with his sentence. Neither presents arguments which merit reversal of the district court. Accordingly, we affirm the appellants' convictions and sentences. We have jurisdiction over these appeals pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## I. JOSEPH FAULKNER

### A.  Factual & Procedural Background

Faulkner was a high-ranking member of the Imperial Insane Vice Lords, a Chicago street gang, also known as the Double I's. In 2011, he was prosecuted for heroin distribution that occurred in 2007 and 2008, and as well as charges related to heroin found in his apartment, discovered upon his arrest in February 2011. Following his arrest, Faulkner debriefed extensively with federal agents, explaining his role in the Double I's, their drug distribution activities, and the identities and roles of other gang members. He pled guilty to a superseding indictment asserting two counts of using a telephone to facilitate drug crimes. At his sentencing for the 2011 prosecution, the government sought, and the court imposed, an above-Guidelines sentence based upon the information Faulkner provided in his own debrief.

In September 2013, while Faulkner remained in prison, the government indicted him again. He and ten other defendants were charged with drug trafficking through the Double I's organization or within its territory. Count One charged Faulkner with participating in a RICO conspiracy under 18 U.S.C. § 1962(d). The government alleged that Faulkner conspired to distribute drugs at the Keystone from 1996 until his arrest in

2011. It also included a generic drug distribution conspiracy count, Count Nine, pursuant to 21 U.S.C. §§ 841(a)(1) and 846.

The final two counts directed at Faulkner, Counts Two and Three, related to the shooting of Tony Carr in January 2010. Count Two charged Faulkner with conspiracy to commit assault with a dangerous weapon, and Count Three was a related gun charge under 18 U.S.C. § 924(c). Carr sold marijuana near Double I territory but was not a member of the gang. Double I member Troy Ross and an accomplice broke into Carr's apartment in January 2010 and stole some marijuana. Carr found out that Ross was responsible and attacked him a few days later. Faulkner and another Double I member came to the scene. The other person helped Ross, but Faulkner did not intervene.

Carr ran away to his base of operations, a nearby cell phone store. Faulkner, Ross, and the other Double I member followed a while later. Ross pulled out a gun and shot Carr. Again, Faulkner stood by and did nothing. Faulkner was the only person charged in the Carr shooting. Ross himself received full federal immunity and a reduced state sentence, which prosecutors called "a phenomenal deal." According to Ross, Faulkner had ordered the shooting and provided the firearm.

Faulkner believed that the 2013 indictment concerned the very same drug distribution conduct that underlay his 2011 prosecution and sentencing. He moved to dismiss the second indictment as a violation of his Fifth Amendment right against double jeopardy. The trial court denied the motion, and this Court affirmed in July 2015. *United States v. Faulkner* [*Faulkner I*], 793 F.3d 752 (7th Cir. 2015).

Faulkner then proceeded to trial before the court sitting without a jury. The government alleged that Faulkner conspired to sell drugs at the Keystone with gang members and affiliated non-members. As to Count One, the evidence adduced at trial consisted of testimony from Double I member Darrell Pitts and two government agents, who testified about the Double I's and their Keystone operation. Faulkner's debrief was also introduced. Finally, the government offered a series of recorded calls obtained pursuant to a wiretap of various Double I members. As to Counts Two and Three, testimony about the shooting came from Ross, Carr, a clerk at the cell phone store, and a Chicago police officer who processed the scene. Faulkner vigorously disputed the quality of the government's evidence, including Ross' credibility, the relevance of Pitts' testimony, and the admissibility of the recorded calls. Despite these concerns, the district judge found him guilty on all counts.

Prior to the trial, the parties waived formal findings, but Judge Bucklo provided detailed findings anyway. As to Count One, she found that the Double I's were indeed a drug trafficking conspiracy and that Faulkner was a member. As to Counts Two and Three, Judge Bucklo found Ross' testimony credible that Faulkner ordered the shooting and did so to intimidate Carr and enhance Faulkner's position in the Double I's. Finally, as to Count Nine, she concluded that Faulkner's long-time leadership of the Keystone market made him responsible for distributing over 1,000 grams of heroin. On June 28, 2016, Faulkner was sentenced to 30 years' imprisonment on Counts One and Nine, 3 years on Count Two, and 10 years on Count Three.

*B. Legal Analysis*

Faulkner filed a timely notice of appeal on July 3, 2016. He raises four issues on appeal: (1) whether the evidence presented at trial was sufficient to support his convictions on Counts One, Two, and Three; (2) whether the district court erred in finding that he did not withdraw from the conspiracy as of the time of his arrest in February 2011; (3) whether his Sixth Amendment right to confrontation was violated by the admission of hearsay statements from alleged co-conspirators; and (4) whether his Fifth Amendment right to be free from double jeopardy was violated by the two prosecutions. The Court will address each point in turn.

1.  Sufficiency of the Evidence

Faulkner first challenges his convictions on Counts One, Two, and Three. "[W]e review a challenge to the sufficiency of the evidence," as Faulkner presents here, "to determine only whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, viewing the evidence in the light most favorable to the government." *United States v. Webster*, 775 F.3d 897, 904–05 (7th Cir. 2015). We cannot re-weigh the evidence or reassess witness credibility. *United States v. Wasson*, 679 F.3d 938, 949 (7th Cir. 2012). In other words, "we will 'overturn the jury's verdict only when the record contains no evidence, regardless of how it is weighed, from which the [factfinder] could find guilt beyond a reasonable doubt.'" *United States v. Peterson*, 823 F.3d 1113, 1120 (7th Cir. 2016) (quoting *United States v. Pribble*, 127 F.3d 583, 590 (7th Cir. 1997)). This burden has been described as "nearly insurmountable." *United States v. Taylor*, 637 F.3d 812, 815 (7th Cir. 2011). None of Faulkner's arguments can carry it.

As to Count One, the government was required to prove "that another member of the enterprise committed … two predicate acts and that [Faulkner] 'knew about and agreed to facilitate the scheme.'" *United States v. Garcia*, 754 F.3d 460, 477 (7th Cir. 2014) (quoting *Salinas v. United States*, 522 U.S. 52, 66 (1997)); Seventh Circuit Pattern Jury Instructions, 18 U.S.C. § 1962(d) Racketeering Conspiracy – Elements, Pattern Requirement – Racketeering Conspiracy; *see also United States v. Amaya*, 828 F.3d 518, 531–32 (7th Cir. 2016) (upholding RICO conspiracy conviction where defendant was an enforcer of gang rules with knowledge that those rules encouraged violence and drug dealing). It did not, as Faulkner suggests, need to show that he was personally involved in two or more of the predicate acts. *Garcia*, 754 F.3d at 477. Thus, Faulkner's first contention—that the district court failed to identify any specific predicate acts—is a non-starter. The evidence adduced on Count Nine, a conviction Faulkner does not challenge on appeal, supplied more than five specific incidents of drug distribution.

Faulkner further argues that the conspiracy charge was improperly predicated solely on his own debrief. *See United States v. Fearns*, 589 F.2d 1316, 1321 (7th Cir. 1978) ("It is a settled principle of the administration of criminal justice in the federal courts that a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused."). The government counters that the debrief was supported by the narcotics recovered during the 2011 arrest and the testimony of various witnesses regarding Faulkner's role as the manager of the Keystone. The government is correct that the debrief was indeed corroborated.

As to Counts Two and Three, Faulkner makes two arguments. First, he alleges that the government failed to prove that he was involved in the Carr shooting. According to Faulkner, Ross' testimony was critical to his conviction on those counts, and Ross' testimony was so rife with inconsistencies that it was entirely beyond belief. Yet, if Ross' testimony is believed, Faulkner does not contest that it establishes that he ordered the Carr shooting. Second, Faulkner says the government did not prove a necessary element of Count Two—namely, that Faulkner was motivated to order the shooting "because he knew it was expected of him by reason of his membership in the [Double I's] or that he committed it in furtherance of that membership." *United States v. DeSilva*, 505 F.3d 711, 715 (7th Cir. 2007) (quotation omitted). Again, Ross' allegedly fantastical testimony supplies the evidence on this element.

The only way this theory can succeed is if Faulkner proves that Ross' testimony was incredible as a matter of law. That occurs when the testimony "is contrary to the laws of nature or so internally inconsistent or implausible on its face that no reasonable factfinder would credit it[.]" *United States v. Collins*, 604 F.3d 481, 486 (7th Cir. 2010).[1] Despite the apparent

---

[1] Faulkner does not cite this concept in his opening brief, but once raised by the government in its response, he makes this the centerpiece of his reply. The Court could thus treat his invocation of this doctrine as waived. *United States v. Alhalabi*, 443 F.3d 605, 611 (7th Cir. 2006). The principle of declaring testimony incredible as a matter of law has certainly existed for decades. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985); *United States v. Cardona-Rivera*, 904 F.2d 1149, 1152 (7th Cir. 1990).

contradiction with the standard of review, this Court has oc-
casionally applied this concept in a sufficiency-of-the-evi-
dence analysis. *United States v. Farmer*, 717 F.3d 559, 561–63
(7th Cir. 2013); *United States v. Saunders*, 973 F.2d 1354, 1359–
60 (7th Cir. 1992). For instance, in *Saunders,* the jury heard
from a witness with poor and inconsistent recollection re-
garding a charged cocaine distribution conspiracy. We ex-
plained that:

> [t]he [challenged] evidence was not inherently
> unbelievable or improbable. Although James'
> testimony on direct and cross-examination did
> contain some inconsistencies—which, we note,
> defense counsel called to the jury's attention—
> the jury chose to believe James nonetheless.
> … The jury heard and rejected Saunders' claim
> that James' testimony was "wildly improbable,"
> and we are not at liberty to second-guess that
> determination.

*Saunders*, 973 F.2d at 1359–60. Like Saunders, Faulkner argued
that Ross' testimony was filled with material inconsistencies
and impossibilities. The district court was well aware of them
and credited Ross' testimony anyway. We detect nothing so
"wildly improbable" in his testimony that Judge Bucklo's
credibility determination cannot stand as a matter of law. This
is reinforced by the deference we must accord to any fact-
finder, be they judge or jury. The factfinder, not this Court,
was in the best position to assess Ross' age, his intelligence,
his ability to comprehend and remember events, his de-
meanor, and the strength of any potential bias.

Faulkner also makes much of the alleged irrationality un-
derpinning his involvement in and motivation for the Carr

shooting. He stresses, for instance, that it made no sense to murder Carr without first trying other means to force him out, for Ross to not be punished for failing to kill Carr, or for Faulkner to allow Carr to live, and indeed resume his business, after the failed assassination. This assumes that individuals, including those like Faulkner or otherwise, only act towards their highest, most rational ends. Judge Bucklo was not required to make such an assumption, and neither are we. Ross' testimony supports the motivation requirement, and that ends the inquiry. *Webster*, 775 F.3d at 904–05.

Though we may have assessed Ross' credibility differently in the first instance, that is not our task today. With Ross' testimony in hand, it is clear that sufficient evidence exists to support Faulkner's convictions on Counts Two and Three.

> 2. Withdrawal From the Conspiracy and Co-Conspirator Statements

Faulkner's second and third points on appeal fall together. The second bears upon Count One. He says that the government conceded the end of his involvement in the gang by limiting its conspiracy charge to February 2011, the time of his arrest and debrief. He also notes that after he debriefed, the government began wiretapping the Double I's. Only one witness, and only one call, from that post-arrest period allegedly involved Faulkner himself. The call was not recorded, however, and there was nothing to corroborate its occurrence. All of the other relevant calls were third parties talking about, rather than with, Faulkner. Faulkner contends that he necessarily withdrew from the conspiracy as of the date he debriefed with the government. *See United States v. Nagelvoort*, 856 F.3d 1117, 1128–29 (7th Cir. 2017). In his third point,

Faulkner asserts that the recorded calls were inadmissible, either because he had already withdrawn from the conspiracy, or, even if he had not, the statements in the calls were not made in furtherance of the conspiracy. *Id.*; *see also* Fed. R. Evid. 801(d)(2)(E).

These points are academic, as Faulkner does not explain why he suffered any prejudice from the erroneous admission of this evidence. Faulkner may only come before us to contest his conviction and sentence. *See* 28 U.S.C. § 1291; 18 U.S.C. § 3742(a). His points on appeal must relate to one or both of those issues, but the withdrawal argument is untethered from either. As to his conviction, "[a] withdrawal defense to a conspiracy charge is relevant only when 'coupled with the defense of statute of limitations.'" *United States v. Nava-Salazar*, 30 F.3d 788, 799 (7th Cir. 1994) (quoting *United States v. Read*, 658 F.2d 1225, 1233 (7th Cir. 1981)). Withdrawal does not "absolve a defendant from his membership in the conspiracy" or otherwise "negate that charge." *Id.*

Faulkner obfuscates the reasons why withdrawal matters. In his opening brief, he states:

> In the typical case, a withdrawal defense is important when coupled with the statute of limitations defense. Here, even if Faulkner withdrew, the Indictment was brought before the statute of limitations expired. Still, the defense informs other areas, including whether statements admitted were co-conspirator statements (if Faulkner had withdrawn, the statements are hearsay -- Issue III), whether double jeopardy applies (Issue IV), and whether his drug amount was properly calculated, and a correct

> sentence imposed (the amount was not, nor is
> the sentence).

(Docket #27 at 41). This paragraph is confusing at best. Faulkner concedes that he does not raise a statute of limitations defense, and other than this single offhand remark, his appeal does not challenge his drug quantity or sentence. While Faulkner maintains that the withdrawal issue "informs" other areas of his appeal, this is not the case in practice. Faulkner fails to even mention the withdrawal issue in his double jeopardy argument, and in his reply, he tries to stretch the withdrawal issue into his sufficiency of the evidence attack.

Whatever his shifting theories on the matter, Faulkner does not explain why the verdict would have been different without the post-arrest evidence. Indeed, Judge Bucklo herself indicated it would not have been.[2] As noted above, Faulkner's convictions were amply supported by conduct occurring prior to his February 2011 arrest. Faulkner does not argue otherwise. *See Nava-Salazar*, 30 F.3d at 799 ("[A]ny alleged

---

[2] From the December 8, 2015 hearing wherein Judge Bucklo delivered her verdict:

MR. GREENBERG: Judge, I have a question. You – we had submitted a withdrawal defense. And you said intercepted calls after he was arrested, after Mr. Faulkner was arrested, I thought I heard you say?

THE COURT: In truth, I don't know that it makes any difference at all in terms of the verdict, but I – it seems to me that it's pretty clear that he would have to make an affirmative step to withdraw. And I think I can consider the statements of other people who were involved in the conspiracy as to whether he withdrew. I know I must – must decide that somebody is involved in the conspiracy by their own statements. But, at any rate, I'm not – I don't know what difference it would make anyway.").

(Docket #35 at GA 14–15).

withdrawal of these two defendants from the conspiracy was irrelevant in determining their guilt or innocence of the conspiracy charged in the indictment. Neither makes any claim or showing that the denial of a withdrawal instruction prejudiced him, as might be the situation if actions by other conspirators after a particular conspirator withdrew are used to prove the guilt of that withdrawing conspirator."). And as discussed below, the withdrawal issue is ultimately irrelevant to Faulkner's double jeopardy argument, as it fails for other reasons. We are left, then, with no material purpose for addressing withdrawal. This court is not in the business of offering advice on legal quandaries. *See United States v. McHugh*, 528 F.3d 538, 541 (7th Cir. 2008) (a recommendation to the Bureau of Prisons made after sentencing presented no justiciable controversy).

The same logic applies to Faulkner's admissibility argument. Whether or not the co-conspirator statements were actually admissible, Judge Bucklo committed no harmful error by admitting them. *United States v. Garcia-Avila*, 737 F.3d 484, 490 (7th Cir. 2013) (even when evidence is erroneously admitted, "reversal only follows if … an average juror would find the prosecution's case significantly less persuasive without the improper evidence.") (citations and quotations omitted). Again, Faulkner offers no reason to suggest that the calls altered the outcome of the case. Instead, he emphasizes what appears to always have been his main objective in excluding the calls: his claim that double jeopardy bars this prosecution.

### 3. Double Jeopardy

Faulkner's final point on appeal is his renewed claim of double jeopardy. He has already appealed and lost on that ground. *Faulkner I*, 793 F.3d at 758. At that time, the Court of

Appeals observed that Faulkner raised two species of double jeopardy claims. *Faulkner I*, 793 F.3d at 755. First, he alleged that he was punished twice for the same drug dealing conduct. *Id.* at 756. Though the drug distribution charges were dropped in the 2011 prosecution, the evidence thereof formed part of the district court's sentencing determination. *Faulkner I* determined that under *Witte v. United States*, 515 U.S. 389, 399 (1995), using the same conduct for a prosecution and for a sentencing does not constitute double punishment. *Id.*

Second, Faulkner argued that he was prosecuted multiple times for the same offense. *Id.* at 757. To prove that claim,

> Faulkner must establish a *prima facie* showing that both prosecutions were for identical offenses; if he does, the burden shifts to the government to show, by a preponderance of the evidence, that the indictments (or informations) charged different crimes. To determine whether the indictments charged the same offense, the court generally looks to the test set forth in *Blockburger v. United States*, 284 U.S. 299 … (1932): "whether each offense contains an element not contained in the other."

*Id.* at 757–58 (citations omitted). *Faulkner I* held that each count in the new prosecution survived the *Blockburger* test. *Id.* at 758. Counts Two and Three, violence charges related to the Carr shooting, were "clearly distinct from heroin distribution." *Id.* Counts One and Nine, though directly related to drug dealing, were conspiracy charges. Thus, two material differences arose: "[c]onspiracy involves the element of an agreement, which is not an element of a substantive drug dis-

tribution offense; on the other side, the substantive offense re-
quires completion of the crime, which is not an element of
conspiracy." *Id.* Finally, the court applied *Blockburger* to the
charges to which Faulkner eventually pleaded guilty—using
a phone to commit a felony. *Id.* The distinctions between those
crimes and the charges in the 2013 were, as might seem obvi-
ous, even greater. *Id.*

The government asserts that these holdings are the bind-
ing law of the case. That doctrine provides that we should
find *Faulkner I* controlling on the double jeopardy question
unless "(1) a subsequent trial produces substantially different
evidence, (2) controlling authority has since made a contrary
decision of law applicable to the issue, or (3) the prior decision
was clearly erroneous and would work manifest injustice."
*White v. United States*, 371 F.3d 900, 902 (7th Cir. 2004) (quota-
tion omitted). Faulkner appears to offer the same two species
of double jeopardy claims as he presented earlier. He main-
tains that his trial, and the evidence presented therein, con-
firms that the prosecutions were for the same conduct. In par-
ticular, Faulkner says that if the improperly admitted rec-
orded calls are excluded, the evidence is precisely the same.

These arguments miss the mark. Faulkner focuses on the
merits of his double jeopardy challenge, paying little heed to
the law of the case doctrine. He does not even attempt to ex-
plain which of the three paths he seeks to navigate to avoid
*Faulkner I*, but the only one that might apply is the last. He has
cited no new, controlling authority, and he makes no argu-
ment that the evidence presented at trial was different than
that available to him during the interlocutory appeal. Nota-
bly, Faulkner's evidentiary comparisons are directed at the
similarity of the evidence between the two prosecutions, not

between the evidence presented during the earlier appeal and at trial.

Further, we find no clear error in our prior decision. The primary distinction between the instant appeal and the prior one is Faulkner's discussion of *United States v. Schiro*, 679 F.3d 521, 527–28 (7th Cir. 2012), which suggested that duplicative evidence in successive prosecutions may present a double jeopardy problem. This same concept is found in *United States v. Calabrese*, however, which Faulkner cited in the prior appeal. 490 F.3d 575, 580–81 (7th Cir. 2007). The prior panel thus considered the issue and, although it did not comment upon *Calabrese* directly, necessarily rejected Faulkner's argument.

The only other material new to this appeal is a citation to *Gries*, which states the ordinary proposition that "[a] lesser-included offense nests within the greater offense and therefore flunks the *Blockburger* test." *United States v. Gries*, 877 F.3d 255, 259 (7th Cir. 2017). Faulkner hopes to extend that holding to his case by claiming that "[h]ere, the earlier prosecution 'nests' within the latter." (Docket #45 at 22). In a problem that plagues several aspects of his appeal, Faulkner raises this argument for the first time in his reply, thus waiving it. *Alhalabi*, 443 F.3d at 611. Besides, were it not waived, *Faulkner I* provided a detailed rejection of the position. *Faulkner I*, 793 F.3d at 758.

At oral argument, Faulkner all but conceded that his double jeopardy argument must fail before this court. In response to the panel's questioning, counsel stated that "if I don't raise it here, I can't try and disagree with [the Supreme Court's *Witte* decision] later on." He may rest assured that the matter is preserved for a petition for a writ of certiorari. In this court,

however, he fails to provide good reasons to overturn *Faulkner I*, and that forecloses the point at this stage.

## II. OTIS SYKES

We now turn to Faulkner's co-defendant, Otis Sykes. He was charged in the same 2013 indictment attacking the Double I's operations. Sykes was not a member of the gang but worked as a street-level seller. He was nevertheless charged with conspiring to distribute a controlled substance, in violation of 21 U.S.C. § 846, and seven counts of distributing heroin and cocaine base, in violation of 21 U.S.C. § 841(a)(1). After a bench trial, he was found guilty on all counts. Judge Bucklo found that Sykes was responsible for distributing less than 100 grams of heroin.

The matter proceeded to sentencing. The presentence report calculated a sentencing Guidelines range of 135 to 168 months' imprisonment. It further noted the government's intention to introduce evidence of uncharged conduct, namely the murder of Andre Brown. Brown was a Double I member and engaged in various acts of extortion and violence in the Keystone area. He had also robbed Sykes about a week prior to his death. He was killed on the street by two hooded men on June 22, 2012. The district court held multiple evidentiary hearings on the Brown murder. It took testimony from several witnesses who placed Sykes at the scene with a gun, though none saw him actually shoot Brown. Sykes contends that the witnesses lacked credibility and that someone else likely killed Brown.

The district court also conducted multiple hearings on Sykes' sentence, largely directed at arriving at the correct Guidelines calculation. In the course of those hearings, the

district court held that Sykes' participation in the Brown murder was established by a preponderance of the evidence. Judge Bucklo nevertheless stated that she would accord it little weight in determining an appropriate sentence. The government argued for a 226-month sentence based on the Brown murder, Sykes' repeated re-involvement in drug dealing, the quantity of drugs, and Sykes' criminal history. The government observed that Sykes was nearly a career offender, and if he had been, his Guidelines range would have been 210 to 262 months' imprisonment.

Sykes asserted that the government's invocation of the Brown murder violated the spirit, though not the rule, of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which requires "that juries make factual findings that increase either the minimum or maximum length of a statutory sentencing range." *Faulkner I*, 793 F.3d at 757. He maintained his innocence of the shooting. Sykes further argued that he was a street-level dealer selling small quantities of drugs, and so the government's requested sentence would be disparate from those of his similarly situated co-defendants. Finally, Sykes explained that while his criminal history was significant, it did not include weapons-related or violent convictions.

Judge Bucklo sentenced Sykes to 195 months' imprisonment. She felt that the Guidelines range did not account for all of Sykes' conduct that she was required to consider under the sentencing factors stated in 18 U.S.C. § 3553(a). First, although Sykes himself was not convicted of violent crimes, he participated in a drug conspiracy for years which he knew involved violence. Second, he had not learned any respect for the law from his prior drug convictions. Each time he was re-

leased back to the community, Sykes returned to drug deal-
ing. Third, Sykes had participated in the Brown murder.
Again, however, Judge Bucklo stated that she would accord it
limited weight. Finally, Judge Bucklo noted that Sykes did not
accept responsibility for participating in the conspiracy.

Sykes presents one issue on appeal: whether his above-
Guidelines sentence was unreasonable because the district
court misapplied the Section 3553(a) factors. Section 3553(a)
provides that a sentencing court must "impose a sentence suf-
ficient, but not greater than necessary" to achieve the goals of
sentencing, which include promoting respect for the law,
punishment, deterrence, and protection of the public. 18
U.S.C. § 3553(a), (a)(2). It supplies seven factors the court
must consider in carrying out this task. *Id.* § 3553(a)(1)–(7).
These include accounting for the circumstances of the offense
charged, the defendant's criminal history, the need for deter-
rence and public protection, the Guidelines range, and the de-
sire to avoid unwarranted sentence disparities among simi-
larly situated defendants. *Id.*

We use a two-step process to review Judge Bucklo's sen-
tencing determination. First, "we determine whether the dis-
trict court committed any procedural error, 'such as failing to
calculate (or improperly calculating) the Guidelines range,
treating the Guidelines as mandatory, failing to consider the
§ 3553(a) factors, selecting a sentence based on clearly errone-
ous facts, or failing to adequately explain the chosen sen-
tence—including an explanation for any deviation from the
Guidelines range.'" *United States v. Reyes-Hernandez*, 624 F.3d
405, 409 (7th Cir. 2010) (quoting *Gall v. United States*, 552 U.S.
38, 51 (2007)). Review for procedural errors is *de novo. United*

*States v. Rivera*, 847 F.3d 847, 849 (7th Cir. 2017). If no procedural error is found, then the sentence is reviewed for substantive reasonableness. *Reyes-Hernandez*, 624 F.3d at 409. A sentence is substantively unreasonable only when the district court abused its discretion in imposing the sentence in question. *Gall*, 552 U.S. at 51.

"We presume that a sentence within a properly calculated Guidelines range is reasonable, but there is no corresponding presumption of unreasonableness for a non-Guidelines sentence." *Reyes-Hernandez*, 624 F.3d at 409 (quotation omitted). Above-Guidelines sentences will be upheld if the district court offered an adequate statement of reasoning therefor, consistent with the Section 3553(a) factors. *United States v. Lewis*, 842 F.3d 467, 477 (7th Cir. 2016). The appellate court must determine whether the justification offered comports with the degree of variance from the Guidelines. *Id.* at 477–78. This assessment accounts for the sentencing judge's "superior position to find facts and judge their import under section 3553(a) in the individual case." *Id.* at 478 (quotation omitted).

Sykes argues that Judge Bucklo made three errors in arriving at his above-Guidelines sentence. First, he alleges that she gave too much weight to his criminal history. Most of the prior convictions were for drug distribution which were subsumed into the conspiracy charge. These were thus already considered in arriving at the Guidelines range, and should not have been used to further increase his sentence. Second, Sykes argues that the Brown murder should have been accorded no weight at all, as he was never charged with the murder or tried by a jury, and the evidence arrayed against him was unreliable. Though Judge Bucklo said she gave the matter little weight, Sykes believes she in fact gave it substantial weight as

shown by her substantial upward variance from the Guidelines. Third, Sykes believes that Judge Bucklo failed to consider the disparity between his sentence and those of similar co-defendants. He notes that the other street-level dealers received sentences ranging from 21 to 75 months. Sykes claims that Judge Bucklo did not address the question of disparity or justify his sentence in comparison with the others.[3]

None of these allegations of error have merit. Sykes does not dispute his criminal history. The presentence report discusses an extensive history with ten convictions, spanning nine years, with eight of those for drug-related offenses. Sykes contends that Judge Bucklo unduly relied on his criminal history despite many of the convictions being subsumed into his offense conduct. Sykes also argues that to the extent they were properly considered, the prior convictions were minor marijuana possession and distribution of small drug quantities, and which should not count for much. But Judge Bucklo was primarily concerned with the length of the history, and the pattern of offenses, namely that Sykes never learned to leave the drug dealing life behind even after so many convictions.

---

[3] The government characterizes these as accusations of procedural error, and couches its brief in those terms. We are not so sure. Sykes does not clearly delineate whether he pursues a procedural or substantive challenge to the sentence. His brief says that Judge Bucklo "misapplied" the Section 3553(a) factors and imposed a sentence which was too long. (Docket #24 at 17). Misapplication, as he uses the term, equates to weighing the factors incorrectly. This is not the same as failing to consider them at all, which *would* be a procedural error. Additionally, his arguments emphasize the alleged unreasonableness of his sentence, further suggesting that his is a substantive challenge. In the end, it matters little; Judge Bucklo's sentencing determination is beyond reproach even upon *de novo* review.

Next, Sykes suggests that Judge Bucklo should not have concluded that he was involved in the Brown murder by a preponderance of the evidence. He does not contest that the conduct is a valid sentencing consideration once Judge Bucklo made that finding, however. It appears that Sykes' primary point is that Judge Bucklo should have given little or no weight to the Brown murder as an enhancement. We must, however, take Judge Bucklo at her word when she said it was given little weight. Judge Bucklo mentioned the murder at the final sentencing hearing and emphasized that she would give it less weight than what one would expect from such a serious offense.

Finally, Judge Bucklo admittedly said nothing about disparity. This was not error, however, for two reasons. First, there is generally no disparity problem so long as the remainder of the sentencing explanation makes it plain that the disparity was warranted. *United States v. Castaldi*, 743 F.3d 589, 597–98 (7th Cir. 2014). Judge Bucklo's citation to the particular facts of Sykes' case make this plain.

Second, and more importantly, Sykes said precious little about disparity himself. He cannot now fault Judge Bucklo for failing to address it more thoroughly. His sentencing memorandum listed the sentences of eight co-defendants and claimed that they were similarly situated street-level dealers. The memorandum does not explain the facts of the co-defendants' cases, their Guidelines ranges, or any other sentencing considerations. The only analogy Sykes offered was to Jasmine McClain, saying that the two "were literally standing side-by-side making similar sales of small quantities." But Sykes gave no further details about why McClain received her particular sentence. Sykes' sentencing colloquy was similarly

lacking in detail, mentioning disparity without delving into the facts of the co-defendants' sentences. Sykes also simply reiterated what he said about McClain in his memorandum.

Only now, on appeal, does he come close to a developed disparity argument, though it is still short on important details as to each of the allegedly similar co-defendants. He lists the same eight co-defendants and their sentences and offers the same argument regarding McClain. The only new information relates to Kyle Pagan, where Sykes discusses Pagan's offense level, criminal history category, and Guidelines range. The Pagan argument was not presented to Judge Bucklo and we will not consider it for the first time on appeal. *Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 595 (7th Cir. 2017).

The root of Sykes' disparity argument was revealed at oral argument. There, counsel admitted that before Judge Bucklo, Sykes' trial counsel did not raise the disparity issue "as one might have hoped it would be raised." Instead, counsel suggested that Judge Bucklo should have further addressed disparity simply because she was "the same judge who had sentenced all of these people." This is no reason to question her sentencing determination. District judges sentence numerous defendants every year, and in multi-defendant cases, each of the accused may be sentenced months apart. Sykes has no right to rely on Judge Bucklo's general familiarity with the case as a substitute for a well-developed argument. Sykes' filings, before both this Court and the district court, do not adequately explain how the sentencing differences should be viewed as a disparity. *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) (holding that "a sentencing difference is not a forbidden 'disparity' if it is justified by legitimate considerations").

It is worth noting that Judge Bucklo exceeded the Guidelines range by just eighteen percent. This variance was well-founded in her sentencing explanation. We find no error, procedural or substantive, in Sykes' sentence. *Castaldi*, 734 F.3d at 598–99 (sentence fifty percent above Guidelines range was substantively reasonable with explanation from district court); *United States v. Smart*, 603 F. App'x 500, 502 (7th Cir. 2015) (similar, at thirty-five percent above Guidelines); *United States v. Hayden*, 775 F.3d 847, 849–51 (7th Cir. 2014) (similar, at fifty percent above Guidelines, with a defendant whose "real complaint," like Sykes, "seems to be that he did not get what he wanted, not that the district court didn't consider the [factors]"). We must therefore affirm the sentence.

*** 

Neither Faulkner nor Sykes offers sufficient reasons to call their convictions or sentences into question. As a result, we AFFIRM.