In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 20-3119

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JEREMIAH S. FARMER,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 15-cr-72-27 — **Philip P. Simon**, *Judge.*

_____

SUBMITTED JANUARY 20, 2022[*] — DECIDED JUNE 28, 2022

_____

Before ROVNER, BRENNAN, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Appellant Jeremiah Farmer, a member of the Latin Kings street gang, brutally bludgeoned Marion Lowry and Harvey Siegers to death with a hammer in 1999. In 2019, a federal jury convicted Farmer of conspiracy to participate in racketeering activity, in violation of the

_____

[*] We granted the parties' joint motion to waive oral argument for this case.

Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1962(d), and conspiracy to possess illegal narcotics with intent to distribute, in violation of 21 U.S.C. § 846. The district court sentenced Farmer to a term of life imprisonment. Farmer now challenges his convictions and sentence in arguments raised both by appointed appellate counsel and pro se. We disturb neither Farmer's conviction nor his sentence.

## I. Background

On this procedural posture, we view the evidence in the light most favorable to the government and describe the facts assuming the jury believed the government's evidence. *United States v. Amaya*, 828 F.3d 518, 523–24 (7th Cir. 2016). At trial, the government presented evidence concerning the gang in general and Farmer's individual conduct. Farmer admits he was a Latin King and does not dispute significant details about the gang's structure and operation or his participation.

### A. The Latin Kings and Jeremiah Farmer

The Latin Kings are a violent street gang headquartered in Chicago, Illinois and operating out of local chapters known as "hoods." The Latin Kings engage in various illegal enterprises, including trafficking in drugs, guns, and murder. Latin Kings members are required to "put in work" for the gang, which includes selling drugs, committing robberies (referred to as "hitting licks") and remitting the proceeds to the gang, attacking members of rival gangs, and intimidating witnesses (called "snitches") who might testify against Latin Kings members. Latin Kings are also expected to pay membership dues and attend regular hood meetings where they discuss gang business.

Latin Kings identify each other through a series of visual and verbal symbols and identifying marks. They use distinctive handshakes and gang signs which only members are permitted to use. Many Latin Kings get gang symbols tattooed on their bodies and faces. Only current Latin Kings are permitted to have such tattoos. The gang's rules are laid out in a manifesto distributed to each member of the gang.

Although his precise date of initiation is unclear, Farmer became a member of the Latin Kings in the mid-1990s. In 1997, Farmer hit a man with a brick, stole over $1,000, and used the money to buy drugs on behalf of the Latin Kings. That same year, Farmer bragged to Tiffany Malinauskas, his then-girlfriend, about being a King and holding a leadership role within the organizations, had gang tattoos, used gang signs and handshakes with other Latin Kings, and possessed a gang manifesto. In a 2016 phone conversation, Farmer claimed he had been a member of the Latin Kings for 21 years.

As a Latin King, Farmer attended mandatory hood meetings, paid gang dues, and committed crimes on behalf of the organization. Farmer sold drugs and guns to Latin Kings members Gabriel Jalomos, and Oscar Gonzalez. Malinauskas witnessed Farmer sell cocaine and crack cocaine. In 1997 or 1998, Farmer shot at a house because the occupants were "a bunch of snitches." In 2009, Farmer hit Joe Gursky in the face with a crowbar, pointed a gun at him as he lay on the ground, informed Gursky he was under orders to kill him for "snitching on brothers," and told Gursky not to go to the police. Farmer then stole money from Gursky's wallet. Farmer remained an active member of the Latin Kings while incarcerated in Indiana State prison in 2010 and bragged about holding a leadership position within the gang.

**B. The Lowry and Siegers Murders**

Marion Lowry owned Calumet Auto Rebuilders ("Calumet Auto"), at which Harvey Siegers worked. Calumet Auto was located in Latin Kings territory adjacent to a convenience store and laundromat where gang members dealt drugs. In the months leading up to June 1999, many Latin Kings, including Farmer, believed Lowry and Siegers were "snitching" on the gang's activities to police. Farmer and other Latin Kings smashed car windows at Calumet Auto to intimidate Lowry and Siegers and deter them from speaking with police.

On June 25, 1999, Clarissa Holodick saw a white man with blonde hair running away from Calumet Auto. Holodick entered Calumet Auto and discovered Lowry and Siegers lying in a pool of blood. Their injuries were horrific. Both suffered blunt force trauma to the head and face resulting in multiple skull fractures. Lowry had numerous brain lacerations. Siegers had a broken jaw, a large hole in the front of his skull, and a lacerated eyeball which had popped out of its socket. Lowry was already dead by the time first responders arrived at the scene. Siegers succumbed to his injuries later at the hospital. Law enforcement recovered a distinctive pair of sunglasses at the scene which were later identified as belonging to Farmer. The specifics of Lowry and Siegers's injuries were not publicized.

Within an hour of discovering Lowry and Siegers, Holodick described the man she saw fleeing from Calumet Auto to law enforcement and began working with Alcohol Tobacco Firearms and Explosives Special Agent Eric Ellis to create a composite sketch using Electronic Facial Identification Technique. Holodick described each feature of the suspect. If the sketch did not reflect her recollection of that feature, Ellis

altered the sketch until it matched Holodick's description. The process took approximately 4.5 hours. Law enforcement did not show Holodick any photos before or while she created the sketch. Once complete, law enforcement published the sketch around the community. Malinauskas and Glen Kok, a former Latin Kings member, saw the sketch and believed the suspect looked like Farmer.

Farmer was upset the night of June 25, 1999, and appeared to have changed his clothing. Malinauskas recalled Farmer came home in a panic, bloody, and tried to wash his clothing with bleach. Jason Gibbs, a former Latin King, saw Farmer, who seemed agitated and freshly showered, later that night wearing a neighbor's clothes. After the Lowry and Siegers murders, Farmer tattooed two filled-in teardrops on his face which, in Latin King circles, traditionally signifies the number of people the wearer has killed.

Farmer repeatedly claimed responsibility for the Lowry and Siegers murders. Farmer told Byron Wren, a now-deceased member of the Latin Kings, he killed Lowry and Siegers because he feared they saw him shoot at a car and wanted to make sure they kept their mouths shut. Farmer described killing the men with a hammer and then stealing money. A few weeks after the murder, Farmer told Malinauskas he "killed two men with a hammer" and was scared because he believed he dropped his sunglasses at the scene. Farmer said he murdered the men "for drug money, or something about money." Farmer later recounted killing Lowry and Siegers with a hammer to Gibbs, describing how good it felt to hold "a man's life in the palm of his hand," the sensation of breaking bones and jaws and teeth, and what it was like to hit someone so hard their eye nearly fell out. Gibbs recalled Farmer

describing how Lowry and Siegers cried and begged for their lives. Farmer told Gibbs he killed the men because they should have known better than to "snitch" in Latin Kings territory. Farmer further told Gibbs he "hit a lick" after killing Lowry and Siegers. Robert Davis, a local youth, ran into Farmer at a basketball court where Farmer told him he "went into the garage, had a sledgehammer, and [ ] hit the guys." Davis recalled Farmer repeating this story at a party.

Almost two years later, on April 18, 2001, officers Thomas Grabowski and Anthony Adams showed Holodick a six-person photo identification array. While Holodick was able to eliminate four of the persons photographed, she was unable to affirmatively identify Farmer. Grabowski and Adams both testified the photo array Holodick viewed did not display names. In May 2001, Hammond police executed a search warrant at Farmer's father's house. Officers recovered scrapbooks, photographs, drawings, and letters written to and by Farmer.

## C. The Coffman Assault

In the late 2000s, Katarina Coffman was associated with the Gangster Disciples, another violent street gang. The Gangster Disciples and the Latin Kings are rivals. During 2008 and 2009, Coffman dealt drugs in Latin Kings territory. Farmer threatened Coffman in late 2008, warning her to stop dealing drugs in Latin Kings territory and that he would "come after her" if she continued.

On February 24, 2009, Farmer and another man broke into Coffman's house. Farmer and his accomplice put a gun in Coffman's face, demanded drugs and money, and stole approximately $600 from her purse. While Farmer was leaving

Coffman's house, he shot her twice and her boyfriend once. As a result of the shooting, Coffman suffered permanent damage to her colon and ovaries.

**D. Pretrial Proceedings**

The government ultimately charged Farmer in a Fifth Superseding Indictment on October 18, 2018, with one count of RICO conspiracy, in violation of 18 U.S.C. § 1962(d), and one count of conspiracy to possess illegal narcotics with intent to distribute, in violation of 21 U.S.C. § 846. Specifically, the government charged Farmer with "knowingly and intentionally conspir[ing] to conduct and participate, directly and indirectly, in the conduct of the affairs of the [Latin Kings] enterprise through a pattern of racketeering activity … consisting of multiple acts involving murder[;] … robbery[;] … Hobbs Act Robbery[;] … multiple acts [involving sex trafficking by force, fraud, or coercion[;] … and multiple acts involving narcotics trafficking." The indictment enumerated several specific acts alleged against Farmer, including murdering Lowry and Siegers. Finally, the indictment notified Farmer of the government's intent to seek enhanced sentencing based on the Lowry and Siegers murders and conspiracy to possess and distribute illegal narcotics.

In advance of trial, Farmer moved to suppress Holodick's identification sketch, contending it was unduly suggestive and unreliable. The district court denied Farmer's motion. While Farmer argued Ellis should have solicited descriptions of the suspect from multiple witnesses, the district court noted that, unlike Holodick, the other witnesses "specifically said they could not see the runner's face, so it's hardly surprising that they were not asked to collaborate on the sketch." Moreover, the district court found no evidence anyone

suspected Farmer of the Lowry and Siegers murders until well after Holodick completed the sketch or influenced Holodick to generate a sketch of Farmer's face. Finally, the district court held in the alternative Holodick's identification was sufficiently reliable based on her focus, level of detail, and confidence in the identification. Any doubt as to the accuracy of the identification bore on the weight of the evidence, not on its admissibility.

**E. Trial**

Farmer proceeded to trial on June 24, 2019. At the conclusion of evidence, the district court asked the government to prepare a redacted indictment removing the other defendants from the case caption and deleting any details that did not arise during trial. The government did so and provided a copy of the redacted indictment to Farmer's counsel, the district court, and to the jury during their deliberations.

Farmer objected to the district court's refusal to instruct the jury on the "corroboration rule." The district court declined to give the instruction because, "[o]nce there's sufficient evidence to submit the case to the jury [under Rule 29], I think this issue becomes unimportant and really irrelevant." Contrary to Farmer's suggestion, "there isn't just an uncorroborated admission in this case" but "several admissions that corroborate each other." The district court noted the decision to give a corroboration instruction was within its discretion and deemed "the reasonable doubt instructions and the presumption of innocence instruction" adequately explained the government's burden.

The jury found Farmer guilty on both counts on July 9, 2019. As to RICO conspiracy, the jury specifically found

Farmer murdered Lowry and Siegers while committing or attempting to commit gang activity and conspired to distribute, or possessed with the intent to distribute, 5 kilograms or more of cocaine. With respect to Farmer's narcotics conviction, the jury specifically found Farmer distributed, or possessed with the intent to distribute, 5 kilograms or more of cocaine and 100 kilograms or more of marijuana.

### F. Sentencing and Appeal

The Probation Office calculated Farmer's base offense level as 43, the highest possible offense level, a criminal history score of 12, and a criminal history category of V in the Presentence Investigation Report ("PSR"). As Farmer was convicted under 18 U.S.C. § 1962(d), the most serious "underlying racketeering activity"—here, murder—determined Farmer's base offense level. Probation recommended a four-level upward adjustment to Farmer's base offense level because he was "an organizer or leader of a criminal activity that involved five or more participants." U.S.S.G. § 3B1.1(a). Because Farmer's base offense level was already at the maximum, Farmer's effective total offense level remained 43. Farmer's offense level and criminal history score yielded a recommended Guidelines range of life imprisonment.

The district court sentenced Farmer on October 27, 2020. Farmer represented himself pro se and raised various objections related to his trial and convictions. The district court overruled these factual objections and adopted the PSR without change. The district court sentenced Farmer to a term of life imprisonment on each count of conviction.

Farmer raises two primary challenges to his conviction and sentence on appeal. First, Farmer argues his conviction

for RICO conspiracy was not supported by sufficient evidence. Second, Farmer claims the jury's special finding he murdered Lowry and Siegers in connection with his membership in the Latin Kings was not supported by sufficient evidence, rendering his sentencing procedurally infirm.

Although represented on appeal by appointed counsel, we granted Farmer leave to submit a supplemental pro se brief in which he presented nine additional bases for appeal. First, Farmer claims the government improperly used a federal task force officer to procure a search warrant. Second, Farmer argues the district court improperly denied his motion to suppress Holodick's identification sketch. Third, Farmer maintains the district court erred in admitting evidence of Holodick's photographic array identification. Fourth, Farmer suggests the district court erred in admitting evidence seized during the May 2001 search of his father's home. Fifth, Farmer argues the district court wrongly declined to instruct the jury on the corroboration rule. Sixth, Farmer claims the government constructively amended the indictment. Seventh, Farmer claims the district court improperly imposed a leadership enhancement at sentencing. Eighth, Farmer maintains the government committed prosecutorial misconduct at trial. Ninth and finally, Farmer asserts the government gave an improper closing argument.

None of Farmer's bases for appeal—either raised by appointed counsel or pro se—are meritorious.

## II. Discussion

### A. The RICO Conspiracy Conviction

RICO criminalizes, in relevant part, conspiring to "conduct or participate, directly or indirectly, in the conduct of

[an] enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c)–(d). To prevail at trial on a charge of RICO conspiracy, the government must show "(1) an agreement to conduct or participate in the affairs (2) of an enterprise (3) through a pattern of racketeering activity." *United States v. Brown*, 973 F.3d 667, 682 (7th Cir. 2020) (internal quotations omitted). "Racketeering activity" includes murder, attempted murder, arson, robbery, extortion, and drug trafficking. 18 U.S.C. § 1961(1). A "pattern" of racketeering activity requires a minimum of two related predicate acts of racketeering committed within a 10-year period. *United States v. Hicks*, 15 F.4th 814, 816 (7th Cir. 2021); *Amaya*, 828 F.3d at 531; *see also Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 827–28 (7th Cir. 2016) ("To form a pattern, the predicate acts must exhibit 'continuity plus relationship.'") (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

Farmer argues the government presented insufficient evidence to link the Lowry and Siegers murders or the Coffman assault to gang activity. To be clear, Farmer does not argue he did not commit these acts. Instead, Farmer merely claims he did so pursuant to motives independent of his Latin Kings membership. In reviewing the sufficiency of the evidence supporting Farmer's RICO conviction, we "view the evidence 'in the light most favorable to the government' and we will 'overturn the verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.'" *Amaya*, 828 F.3d at 523–24 (quoting *United States v. Morales*, 655 F.3d 608, 634 (7th Cir. 2011)). We can neither reweigh the evidence nor reassess witness credibility. *United States v. Faulkner*, 885 F.3d 488, 492 (7th Cir. 2018). Farmer faces a "nearly insurmountable" hurdle in challenging the sufficiency of the evidence. *Id*.

(internal quotations omitted). None of Farmer's arguments meet this heavy burden.

As to the Lowry and Siegers murders, Farmer argues first that the government did not supply evidence he was a member of the Latin Kings in 1999 and, second, that the government did not offer sufficient evidence he killed the men to advance the interests of the Latin Kings. By Farmer's account, he killed Lowry and Siegers because they saw him shoot at a car in a crime unrelated to the Latin Kings and Farmer feared they would report him to the police.

Although the precise date of Farmer's membership is unclear, the government presented ample evidence from which a jury could conclude Farmer was a Latin King when he killed Lowry and Siegers in 1999. Kok and Gibbs testified Farmer was a Latin King as of the mid-1990s and at the latest by 1997. Malinauskas testified that, in 1997, Farmer bragged about being a Latin King, had gang tattoos, used gang signs and handshakes with other Latin Kings, and possessed a Latin Kings manifesto. The government offered evidence all these activities—wearing gang tattoos, using gang signs and handshakes, and possessing a manifesto—were restricted to active Latin Kings members. Further, in 2016, Farmer claimed to have been a member of the Latin Kings for 21 years, which would place his initiation at approximately 1995.

Similarly, a jury could easily conclude from the government's evidence that Farmer's activity with the Latin Kings motivated him to murder Lowry and Siegers. The government offered evidence Farmer, along with other Latin Kings, believed Lowry and Siegers were "snitching" on gang activities—specifically, dealing drugs out of the adjacent convenience store and laundromat—to the police. Prior to the

murders, evidence indicates Farmer and other Latin Kings damaged property at Calumet Auto to discourage Lowry and Siegers from reporting gang activity to law enforcement. Gibbs testified Farmer claimed he murdered Lowry and Siegers because they were in Latin Kings territory, were "snitching" on gang activity, and that he "hit a lick"—a term and activity related to the Latin Kings—after killing the men. Farmer also told Malinauskas he killed Lowry and Siegers "for drug money."

As to the Coffman assault, Farmer claims he robbed and shot Coffman of his own volition and unrelated to his involvement with the Latin Kings. Farmer does not dispute he was a member of the Latin Kings at the time of the assault. At trial, Coffman testified she was associated with the rival Gangster Disciples and sold weed in Latin Kings territory. The government produced evidence Latin Kings were expected to attack non-Latin Kings dealing drugs in their territory. Coffman testified, prior to the assault, Farmer told her to stop dealing drugs in Latin Kings territory and threatened to "come after her" if she continued. A jury could reasonably conclude Farmer subsequently made good on this threat. Coffman also testified, on the night of the assault, Farmer stole $600 from her purse. The government presented evidence Latin Kings were expected to remit the proceeds of their robberies to the gang. A rational jury could easily infer Farmer, a Latin King, complied with this obligation and stole some or all of the $600 for the Latin Kings.

The government also offered sufficient evidence of other qualifying predicate crimes. In addition to the specifically identified predicate acts, the government charged Farmer with RICO conspiracy "through a pattern of racketeering

activity … involving … robbery[,] … Hobbs Act Robbery[,] … and multiple acts involving narcotics trafficking." Gibbs testified Farmer hit a man with a brick, stole $1,000 from him, and used the money to purchase drugs on behalf of the Latin Kings. Jalomos, Gonzalez, and Malinauskas all testified they witnessed Farmer buying, selling, and manufacturing drugs. Jalomos and Gonzalez further testified Farmer sold them illegal guns in exchange for drugs. Gibbs provided evidence Farmer shot at a house in 1997 or 1998 because the occupants were "a bunch of snitches," a term used to describe those reporting gang activity to law enforcement. Similarly, Gursky testified Farmer hit him in the face with a tire iron in 2009, stole his money, and threatened to kill him on Latin Kings orders because he was "snitching on brothers."

Farmer's RICO conspiracy conviction is supported by overwhelming evidence. We will not disturb the jury's judgment on sufficiency grounds.

## B. The Sentencing Enhancement

Ordinarily, the statutory maximum sentence for a RICO conspiracy conviction is 20 years' imprisonment. 18 U.S.C. § 1963(a). The maximum increases to life imprisonment, however, "if the violation is based on a racketeering activity for which the maximum penalty incudes life imprisonment." *Id.*; *see also United States v. Perez*, 21 F.4th 490, 493 (7th Cir. 2021). The government sought enhanced sentencing under § 1963(a) in part for the criminal gang murders of Lowry and Siegers, for which Indiana law provides a sentence of death or life imprisonment where the defendant "committed the murder by intentionally killing the victim while committing or attempting to commit … [c]riminal organization activity." Ind. Code § 35-50-2-9(b)(1)(I). To prove criminal organization activity,

the government must provide evidence Farmer "(1) was an active member of a criminal gang, (2) had knowledge of the group's criminal advocacy, and (3) had a specific intent to further the group's criminal goals." *G.H. v. State*, 987 N.E.2d 1164, 1168 (Ind. Ct. App. 2013); *see also Ferrell v. State*, 746 N.E.2d 48, 51 (Ind. 2001). "The specific-intent element requires proof of a nexus between furthering the goals of the criminal gang and the alleged crime." *G.H.*, 987 N.E.2d at 1168.

Farmer claims the government produced insufficient evidence to support the jury's specific finding he murdered Lowry and Siegers "while committing or attempting to commit gang activity." More precisely, Farmer asserts the trial evidence does not establish a "nexus" between his Latin Kings membership and the murders. Consequently, Farmer argues he was prejudiced at sentencing because the statutory maximum penalty increased from 20 years' imprisonment to life imprisonment and his base offense level of 43, when combined with other enhancements, yielded a Guidelines range of life imprisonment.

We review assertions of procedural error at sentencing de novo. *Perez*, 21 F.4th at 493. Because Farmer's sentencing challenge is ultimately rooted in a challenge to the jury's special finding, we review these arguments for sufficiency of the evidence. *Faulkner*, 885 F.3d at 492; *see also Brown*, 973 F.3d at 682–99. The jury's special finding will not be disturbed unless "'no rational trier of fact could have agreed with the jury.'" *Brown*, 973 F.3d at 682 (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)); *see also Amaya* 828 F.3d at 523–24.

Farmer's sentencing challenge is effectively identical to that leveled against his RICO conspiracy conviction. For all

the reasons discussed above, the government provided more than enough evidence linking the murders to Farmer's gang activity. Farmer fails to meet his "nearly insurmountable" burden, *Faulkner*, 885 F.3d at 492 (internal quotations omitted), of demonstrating the government produced "no evidence" supporting the jury's special finding, *Amaya*, 828 F.3d at 523–24 (internal quotations omitted).

## C. Farmer's Pro Se Arguments

We now attend briefly to Farmer's pro se arguments. For the sake of organization, we group these arguments by the applicable standard of review.

### 1. *Precluded by Rule 12(b)(3)*

We can quickly resolve several of Farmer's pro se bases for appeal under Federal Rule of Criminal Procedure 12(c)(3). Defendants must move to suppress evidence in a pretrial motion. Fed. R. Crim. P. 12(b)(3)(C). Failure to "meet the deadline for making a Rule 12(b)(3) motion" renders the motion untimely. Fed. R. Crim. P. 12(c)(3). Rule 12(c)(3) permits conditional, plain error review of untimely suppression motions on appeal provided the defendant "shows good cause" for failing to make those arguments below. *Id.*; *see also United States v. Murdock*, 491 F.3d 694, 698–99 (7th Cir. 2007). Failure to establish good cause precludes appellate review of new suppression arguments. *United States v. Sands*, 815 F.3d 1057, 1061 (7th Cir. 2015).

Three of Farmer's pro se arguments are new suppression arguments he failed to present to the district court. First, Farmer claims that, because a state police officer served as an affiant for a federal warrant, "all evidence that was derived from" that "search should have been suppressed as fruits

from a poisoness [*sic*] tree." Second, Farmer argues officers told Holodick his name while she was viewing the photographic identification array in 2001, which rendered the identification process "unduly suggestive." Third, Farmer seeks to suppress evidence obtained from the execution of the May 2001 search warrant. Farmer neither moved to suppress Holodick's identification or the evidence obtained from the May 2001 search nor, in the case of the search, objected to its admission into evidence at trial. On appeal, Farmer points to no cause, good or otherwise, why he failed to raise these arguments in a timely manner and preserve them for appeal, thus we are precluded from reviewing this issue. *Id*.

### 2. *No Plain Error*

For the first time on appeal, Farmer claims (1) the government engaged in prosecutorial misconduct by characterizing Chris Gootee as a federal agent at trial; (2) the government's closing argument was improper; (3) the government improperly constructively amended the indictment after trial; and (4) the district court erroneously applied a leadership enhancement at sentencing. Farmer forfeited each of these arguments by failing to present them to the district court and thus we review for plain error. *United States v. Jones*, 22 F.4th 667, 675 (7th Cir. 2022); *United States v. Garcia-Avila*, 737 F.3d 484, 491 (7th Cir. 2013). To prevail on plain error review, Farmer must show (1) an error, (2) that is plain, (3) that affected his substantial rights, and (4) that seriously affected the fairness, integrity, or public reputation of the proceedings. *Jones*, 22 F.4th at 675. Farmer fails to do so here.

"When reviewing a claim of prosecutorial misconduct, we first consider whether the remark was improper; then we consider whether it prejudiced the defendant." *Garcia-Avila*, 737

F.3d at 491. "Ultimately, the inquiry turns on whether the improper statement so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. (internal quotations omitted). At the start of trial, the government described Gootee as a "federal agent" who would sit at the table with the prosecution. This description was not improper. Although Gootee is an officer with the Hammond Police Department, he is assigned to the Gang Response Investigative Team, an FBI task force which consists of multiple FBI agents and local police officers. Given Gootee's role on the federal task force, characterizing him as a "federal agent" is not clearly incorrect, and certainly did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. Even supposing the government's characterization was improper, Farmer does not explain how he was prejudiced or how his substantial rights were implicated.

As to the government's closing argument, Farmer "must establish not only that the remarks denied him a fair trial, but also that the outcome of proceedings would have been different absent the remarks." *United States v. Turner*, 651 F.3d 743, 751 (7th Cir. 2011) (internal quotations omitted). "Improper statements made during closing argument are rarely reversible error." *Garcia-Avila*, 737 F.3d at 491 (internal quotations omitted). Apart from listing the pages of the trial transcript containing the government's closing argument, Farmer fails to articulate what, specifically, he considers improper. Nor does Farmer explain how the closing impacted the outcome of proceedings, other than baldly asserting "[t]he Government improperly lead[] the jury to convict." Farmer has failed to meet his burden of identifying an error in the government's closing argument.

Regarding the indictment, constructive amendment occurs when "either the government … , the court … , or both, broadens the possible bases for conviction beyond those presented by the grand jury." *United States v. Perez*, 673 F.3d 667, 669 (7th Cir. 2012) (internal quotations omitted). Narrowing an indictment by dropping allegations unnecessary to an offense "clearly contained" within the indictment does not amount to unconstitutional amendment and, indeed, is a common, desirable practice which avoids potential jury confusion. *Id*. at 669–70 (citing *United States v. Miller*, 471 U.S. 130, 144 (1985)). That is precisely what occurred here. At the conclusion of evidence, the district court asked the government to redact the names of co-defendants and acts left unmentioned at trial to avoid confusing the jury. The government did not err in doing so.

At sentencing, the district court applied a 4-level leadership enhancement to Farmer's base offense level under U.S.S.G. § 3B1.1(a). Such an enhancement is appropriate if Farmer "was an organizer or leader of a criminal activity." U.S.S.G. § 3B1.1(a). Sentencing courts must "find by a preponderance that the facts support a sentencing enhancement." *United States v. Colon*, 919 F.3d 510, 517 (7th Cir. 2019). Although trial evidence supports such an enhancement, the factual basis at sentencing does not. While the PSR describes the leadership structure of the Latin Kings generally, it does not state Farmer was himself a leader, nor does any of the activity ascribed to Farmer in the PSR hint at his leadership role. At sentencing, the district court adopted the PSR wholesale and did not make independent factual findings as to Farmer's leadership status.

Any error, however, is harmless and does not implicate Farmer's substantial rights. Farmer's base offense level was 43, the maximum possible under the Guidelines. *See* U.S.S.G. § 5A n.2 ("In rare cases, a total offense level of … more than 43 may result from application of the guidelines. … An offense level of more than 43 is to be treated as an offense level of 43."). The § 3B1.1 leadership enhancement, then, had no impact on Farmer's Guidelines range or his substantial rights. *See United States v. Thomas*, 897 F.3d 807, 817 (7th Cir. 2018) ("[A] guideline error that does not actually affect the final guideline range calculated by the court … d[oes] not affect [the defendant's] substantial rights or undermine confidence in the proceedings and their final result.").

### 3. *No Abuse of Discretion*

Farmer challenges the district court's refusal to instruct the jury on the corroboration rule. We review such arguments for abuse of discretion with deference to "the broad discretion of the district court to accept or reject a proposed jury instruction so long as the essential points are covered by the instructions given." *United States v. McDowell*, 687 F.3d 904, 912 (7th Cir. 2012) (internal quotations omitted). While it is "well established that a defendant cannot be convicted based solely on his own uncorroborated statement[,]" "the district court is not obligated to instruct the jury on the requirement of corroboration." *Id*. That decision is "better left to the trial judge" as "the standard instructions regarding the government's burden of proof and the presumption of innocence are generally sufficient." *Id*.

First, the district court properly instructed the jury on the presumption of innocence and the government's burden of proof, giving the Seventh Circuit pattern criminal jury

instructions almost verbatim. *See The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit*, Presumption of Innocence/Burden of Proof (2020 Ed.). Second, as the district court observed, Farmer's conviction did not turn on a single, uncorroborated admission of criminal activity. Instead, Farmer confessed to multiple people multiple times he killed Lowry and Siegers in service of his Latin Kings affiliation. In this context, the district court's decision to rely upon the pattern jury instructions is not an abuse of its discretion.

### 4. No Legal Error

Farmer disputes the district court's denial of his motion to suppress Holodick's composite sketch. Broadly, Farmer claims the sketch resulted from "unduly suggestive" procedures, the police should have solicited input from multiple eyewitnesses, and Holodick did not enjoy a sufficiently clear view of his face to generate a reliable identification. We review a district court's denial of a motion to suppress an identification de novo with "due deference to the district court's findings of historical fact." *United States v. Vines*, 9 F.4th 500, 506 (7th Cir. 2021).

Eyewitness identifications "tainted by police arrangement" violate the due process clause and must be suppressed. *Perry v. New Hampshire*, 565 U.S. 228, 238 (2012). To determine whether suppression is necessary, courts first evaluate whether officers used a procedure "that is both suggestive and unnecessary." *Id*. at 238–39. Second, courts "assess, on a case-by-case basis, whether improper police conduct created a substantial likelihood of misidentification." *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2559 (2018) (internal quotations omitted). In evaluating whether such a likelihood exists, courts consider "the opportunity of the witness to view the

criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Id*.

Farmer fails at the first step to demonstrate the procedure used to generate Holodick's composite sketch was "suggestive and unnecessary." First, Ellis did not know of Farmer and no officer suspected Farmer or showed Holodick a picture of Farmer when the sketch was created. Second, although Farmer argues other witnesses should have contributed to creating the sketch, Holodick was the only witness who saw any part of his face. Third, Holodick and Ellis testified to a long, iterative process to create the sketch where Holodick had the ultimate control over the final product. The district court properly declined to suppress Holodick's composite sketch.

### III. Conclusion

For the foregoing reasons, we AFFIRM the Farmer's convictions and sentence.