In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 20-2451

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WILLIAM A. JULIUS,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 19-cr-116 — **William C. Griesbach**, *Judge.*

———————————

ARGUED SEPTEMBER 9, 2021 — DECIDED SEPTEMBER 24, 2021

———————————

Before KANNE, HAMILTON, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* A jury found that William Julius set fire to the building where his ex-girlfriend was living after she spurned his attempts to rekindle their relationship. On appeal Julius argues that the district court erred in allowing lay witnesses to offer expert testimony about the process of extracting data from his cellphone and in cutting off his cross-examination of one of those witnesses. We find no reversible errors and affirm.

## I. Background

A federal grand jury charged Julius with two counts of arson for setting fire to a building where his ex-girlfriend was living, twice in the same night. Julius went to trial on both counts.

The evidence at trial showed that Julius wanted to salvage his relationship with his ex-girlfriend, Dawn Noack, but Noack was uninterested. The government's theory was that Julius set the fires in retaliation for Noack's rejection of his entreaties. At the time, Noack was living with her friend, Maro Saldana, in Saldana's apartment. Shortly before the fires, Julius was hanging around Saldana's apartment on his bike. Saldana approached Julius, told him that Noack did not want to see him, and asked him to leave. On another occasion shortly before the fires, Julius threw rocks at the apartment window. Saldana again asked him to leave.

To prove Julius's motive for setting the fires, the government introduced text messages between Julius and Noack in the days leading up to the fires. The text messages, which law enforcement extracted from Julius's cellphone, showed Noack was upset that Julius would not leave her alone. Julius messaged Noack about his "heartache" and physical affection for her, but in response Noack told him to "quit" and "knock it the fuck off" because "we are over" and "I don't want you with me!" Julius also expressed frustration that Noack was living with Saldana, saying "I don't want you there. They don't like me"; "They better get rid of you"; "It's easier if they throw you out the door"; and "You're out the door." On the afternoon before the fires, Julius mentioned in texts to someone else that he was "sobering up."

On the night of the fires, Julius texted Noack repeatedly between 9:45 p.m. and 10:15 p.m. asking if she was "coming outside." At 10:30 p.m., he called her five times in a row, but she did not answer. After midnight, Saldana's cousin, who lived in the same building, woke up to the smell of smoke. He searched for the source and found burning coals on the inside of the building's front door frame. Saldana's cousin alerted Saldana, who called the police. At 12:57 a.m., the police and fire departments were dispatched to the fire. At 1:03 a.m., Julius called Noack. The call lasted just under a minute. When the police and fire departments arrived at the building, the fire was out but the door frame was still smoking. The captain of the fire department testified that the burned area smelled of gasoline. Testing confirmed the presence of gasoline.

Around 3:30 a.m., the fire captain noticed a larger fire on the other side of the building. This fire, too, was contained, but it caused significant damage to the first floor of the building. The captain concluded that someone started the fires by putting an open flame, like a lighter, to combustibles and gasoline. While he did not smell gasoline near the second fire, he concluded that gasoline "may or may not have been used" because the fire could have consumed the gasoline.

The police suspected Julius of setting the fires. Shortly after the second fire, an officer spotted a man on a bicycle several blocks from the fires. Upon approaching, the officer found Julius hiding under a car with the bicycle close at hand. The officer patted Julius down and found a lighter in his front pocket. Julius did not have any cigarettes or cigars on him. Julius was "clearly intoxicated" but could walk and carry on a coherent conversation. Testing revealed gasoline on Julius's shoes and socks.

The government called two witnesses—a computer forensic examiner with the state police and an agent with the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF)—to testify to the process of extracting text messages from Julius's phone. This testimony laid the foundation for the text messages from Julius's phone. The government did not seek to qualify these witnesses as experts, and Julius did not object on that basis. For reasons that are unclear, the district court ultimately instructed the jury that both witnesses had provided opinion, but not expert opinion, testimony about "telephone extraction data."

Beyond testifying to the extraction process, the ATF agent testified about certain location data obtained from the extraction. On direct examination, she testified that she tried to determine the location of Julius's phone from the extraction data, but that she was unable to "substantiate" the location data in the extraction report and thus could not reach any conclusions as to the phone's location. On cross-examination, defense counsel followed up on the location data. He asked about a specific data point from 1:09 a.m. on the night of the fire. The agent testified that this data point did not provide any information about the location of Julius's cellphone that night. She confirmed, though, that the data point corresponded to a location at "North Clay and 141." Before defense counsel could ask further questions, the government objected. The district court sustained the objection at a sidebar off the record. On redirect, the agent reiterated that there was "no reliable location data" from the cellphone extraction. Later, and back on the record, the court explained the basis for its ruling limiting Julius's cross-examination: The testimony had "no foundation," meaning it "wasn't reliable so it was not admissible as expert testimony or as evidence."

In addition to this evidence, the government introduced several post-indictment letters between Julius and his probation officer.[*] In the letters Julius admitted that he had texted Noack on the night of the fires to ask if she was coming outside. He also provided contradictory accounts of what transpired that night, initially saying that Noack started the first fire and later saying Saldana's son started the fires. Julius elected not to testify on his own behalf. The jury convicted him on both counts. Julius now appeals.

## II. Discussion

Julius maintains that the district court committed two evidentiary errors during trial. We conclude, however, that neither of the asserted errors affected the outcome of the trial. We thus affirm Julius's conviction.

## A. Expert Testimony

Julius begins by challenging the district court's failure to qualify the forensic examiner and ATF agent as expert witnesses before allowing them to testify to the process of extracting data from his cellphone. *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). He relies chiefly on *United States v. Wehrle*, 985 F.3d 549 (7th Cir. 2021), which held that a police officer's testimony about her forensic examination of external storage devices was expert testimony because it involved "technical concepts beyond ordinary knowledge." *Id.* at 554. The devices at issue in *Wehrle* were not cellphones, *id.* at 553 n.2, but Julius contends that *Wehrle*'s

---

[*] Julius was on federal supervised release in another case at the time of the fires. The jury did not know this; they knew the probation officer only as a person with whom Julius had a "professional relationship."

rationale applies with equal force to testimony about extracting data from a cellphone. Other circuits have held that testimony about extracting data from a cellphone is not expert testimony. *United States v. Montijo-Maysonet*, 974 F.3d 34, 48 (1st Cir. 2020); *United States v. Chavez-Lopez*, 767 F. App'x 431, 433–34 (4th Cir. 2019); *United States v. McLeod*, 755 F. App'x 670, 673 (9th Cir. 2019); *United States v. Marsh*, 568 F. App'x 15, 17 (2d Cir. 2014).

We need not resolve this issue. Julius concedes that he did not object to the district court's failure to qualify the forensic examiner and ATF agent as expert witnesses after the government failed to tender them as experts, so we review for plain error. *See* Fed. R. Crim. P. 52(b). To prevail on plain-error review, Julius must show: (1) an error; (2) that is plain; (3) that affected his substantial rights, meaning there is a reasonable probability that the error changed the outcome of the trial; and (4) that "had a serious effect on 'the fairness, integrity or public reputation of judicial proceedings.'" *Greer v. United States*, 141 S. Ct. 2090, 2096–97 (2021) (quoting *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1905 (2018)). Julius has the burden of establishing all four elements, yet he concedes he cannot satisfy the third element. More specifically, he concedes he cannot show that the forensic examiner and ATF agent were unqualified to give the challenged testimony. *See United States v. Thomas*, 970 F.3d 809, 815 (7th Cir. 2020) (finding no plain error where witness's testimony would have been "unobjectionable" had the government offered him as an expert); *see also Wehrle*, 985 F.3d at 554. Julius disagrees with our precedent on plain error in this context, but he does not presently ask us to revisit it. Because there is no plain error, we leave *Wehrle*'s broader implications for another day.

**B. Location Data**

Next, Julius maintains that the district court improperly denied him the opportunity to cross-examine the ATF agent about the location data obtained through the cellphone extraction. As mentioned, the court sustained the government's objection to Julius's cross-examination at a sidebar off the record. Later, the court explained on the record that it sustained the objection because the testimony had "no foundation," meaning it "wasn't reliable so it was not admissible as expert testimony or as evidence."

This reasoning is hard to follow. The court did not qualify the ATF agent as an expert, so it had no basis for considering the reliability of her testimony under the *Daubert* framework. *See Daubert*, 509 U.S. at 590. And while foundation is an important evidentiary concern, it is unclear from the record why the court concluded that the testimony lacked foundation. So, the court's *post hoc* summary of its off-the-record ruling does not necessarily explain its reason for cutting off Julius's cross-examination.

The court's decision to rule off the record also makes it hard for us to know whether Julius preserved his request for further cross-examination. It does not appear from the record that Julius made an offer of proof, *see* Fed. R. Evid. 103(a)(2), but we cannot be sure without knowing what transpired at the sidebar. As we explained more than 30 years ago, the Court Reporter's Act, 28 U.S.C. § 753(b), "requires court reporters to record verbatim 'all proceedings in criminal cases had in open court,'" including sidebars. *United States v. Nolan*, 910 F.2d 1553, 1559 (7th Cir. 1990) (quoting § 753(b)). Without a contemporaneous record of a sidebar discussion, it can be difficult to discern the parties' arguments or the basis for the

court's ruling. *Id.* at 1559–60. Once again, we remind district courts to make evidentiary rulings on the record. *See id.* at 1560 ("The duty to comply with § 753(b) lies with the court, not the parties.").

The government says little in defense of the court's ruling, and instead maintains that the court's error (if any) was harmless. *See* Fed. R. Crim. P. 52(a). "The test for harmless error is whether, in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded." *United States v. Brown*, 973 F.3d 667, 707 (7th Cir. 2020) (quoting *United States v. Emerson*, 501 F.3d 804, 813 (7th Cir. 2007)). The government bears the burden of demonstrating that an error was harmless. *See United States v. Jett*, 982 F.3d 1072, 1078 (7th Cir. 2020).

In the government's view, any error here was harmless because, at best, the location data from the cellphone extraction would have shown that Julius was one mile away from the fires at 1:09 a.m.—12 minutes after the police and fire departments were dispatched to the first fire. The government asks us to take judicial notice of Google Maps data indicating that it would take seven minutes to bike the one-mile distance between the fires and the intersection corresponding to the location data. *See* Fed. R. Evid. 201(b).

We and other courts have taken judicial notice of distance estimates from Google Maps. *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1177 n.3 (7th Cir. 2013), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016); *see also United States v. Perea-Rey*, 680 F.3d 1179, 1182 n.1 (9th Cir. 2012); *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1219 n.2 (10th Cir. 2007). But travel-time estimates are a different matter. Any number of factors could impact a

cyclist's travel time, including the cyclist's level of intoxication (recall that Julius was drunk), the type and quality of the bicycle, and the cyclist's proficiency at riding a bike. The government does not grapple with these variables, so it has not proven that Google Maps is a source "whose accuracy cannot reasonably be questioned" for bike-time estimates. Fed. R. Evid. 201(b)(2); *see also Jackson v. Allstate Ins. Co.*, 785 F.3d 1193, 1204 (8th Cir. 2015) (declining to take judicial notice of Google Maps drive-time estimate for similar reasons).

Even so, we are satisfied that any error the district court made in limiting Julius's cross-examination was harmless. The government introduced powerful evidence of Julius's guilt. Julius was in a tumultuous relationship with Noack, an occupant of the burned buildings. He had been hanging around the building and throwing rocks at it in the days leading up to the fires. In text messages to Noack, Julius expressed frustration that she was staying in the building, even making vague threats such as "They better get rid of you"; "It's easier if they throw you out the door"; and "You're out the door." On the night of the fires, Julius repeatedly texted and called Noack, asking if she was coming outside. Julius called Noack minutes after the first fire. Shortly after the second fire, a police officer found Julius hiding under a nearby car with gasoline on his shoes and socks and a lighter in his pocket. The fire captain would later testify that both fires were caused by someone applying an open flame, like a lighter, to combustibles and gasoline. Meanwhile, in letters to his probation officer Julius provided contradictory accounts of who started the fires.

Given this evidence, we are convinced that further cross-examination about the location data from Julius's phone

would not have affected the jury's verdict. Julius complains that the court's ruling prevented him from arguing to the jury that he was a mile away from the site of the fires 12 minutes after the first fire. With or without a Google Maps estimate, though, a jury could easily infer that Julius could travel one mile by bike in 12 minutes. Moreover, it seems unsurprising that an arsonist might want to distance himself from a fire immediately after setting it. On these facts, the government's case would not have been significantly less persuasive if the court had allowed Julius to further cross-examine the ATF agent about the location data. *See Brown*, 973 F.3d at 707.

AFFIRMED