In the

# United States Court of Appeals
## For the Seventh Circuit

No. 21-1293

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LARRY A. JONES, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:19-cr-00033 — **Damon R. Leichty**, *Judge.*

ARGUED NOVEMBER 29, 2021 — DECIDED JANUARY 6, 2022

Before EASTERBROOK, SCUDDER, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Larry Jones entered a conditional guilty plea to possessing a firearm as a convicted felon after law enforcement discovered a gun during a warrantless search of his motel room. A magistrate judge conducted an evidentiary hearing and recommended denying his motion to suppress the gun. The district court accepted the magistrate judge's report and recommendation, concluding that Jones had not been seized, that he consented to the search, and that

the search was within the scope of his consent. Jones appeals the denial of his motion to suppress, arguing that he was seized when officers knocked on his motel room door and displayed an arrest warrant for a woman reportedly staying in his motel room. Alternatively, he argues any consent he provided was not voluntary and that the search exceeded the scope of his consent. We affirm.

## I. Background

### A. Factual Background

On November 16, 2017, Allen County Sheriff Warrants Division Officers Andrew Brenneke and Duane Romines received an arrest warrant for Whitney Gosnell. Gosnell, listed as 5'3'' and 130 to 140 pounds, had allegedly violated the terms of her probation. Following up on an anonymous tip that Gosnell was staying at the Deluxe Inn Motel in Fort Wayne, Indiana, Officers Brenneke and Romines went to the motel around 8:45 p.m. The motel manager informed them that Gosnell was staying in a room with Larry Jones and his son. The officers ran a warrant check, which revealed that Jones had arrests dating back to the 1990s and was listed as a "known resister," "convicted felon," and "substance abuser."

Officers Brenneke and Romines went to Jones's motel room and listened at the door for voices. Not hearing any, they knocked on the door several times and called out "Larry," but did not hear a response. Officer Brenneke knew Jones's street name, so he called out, "Hey, Crunch," and Jones responded, "What?" One or both officers said, "It's police. We're not here for you," to which Jones said, "She's not here. She can't be here." At this point, the officers had not yet explained that they had an arrest warrant for Gosnell.

The officers asked Jones to open the door, and he requested some time before opening it. Both officers estimate that approximately 30 to 60 seconds elapsed between the first knock and when Jones opened the door, fully dressed. The officers were in full uniform with their guns holstered, and there is no dispute that they spoke in conversational tones throughout the encounter. The officers reiterated that they were not there for Jones, showed him the arrest warrant for Gosnell, and explained that they would like to "verify" Gosnell was not there. Officer Brenneke estimates they spent approximately 15 to 20 seconds explaining they would like to search where a person could be or would hide. Jones repeated that Gosnell was not there but eventually said, "That's fine," and moved away from the door. Officer Romines estimated they talked to Jones for less than a minute before entering. At some point, Officer Romines told Jones they "would not open small drawers and things like that."

After entering the motel room, the officers looked in the kitchenette, bathroom, and shower. Officer Romines then lifted up one of two beds but found nothing underneath. There was a six-to-ten-inch gap between the beds and the floor. Before Officer Brenneke checked under the second bed, Jones stated, "Well, she couldn't be under there." Officer Romines responded, "She could be under there, just like she could have been under the first one." Officer Brenneke proceeded to lift the second bed and saw the firearm.

## B. Procedural Background

Jones was eventually indicted and arrested in 2019 for possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). He moved to suppress evidence of the gun. The

district court referred the case to a magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1).

### 1. The Magistrate Judge's Report and Recommendation

The magistrate judge conducted an evidentiary hearing on November 13, 2019. During the hearing, Officers Brenneke and Romines testified regarding the events at the motel room. They further explained that they had found people hiding in or under beds when attempting to serve warrants. Jones did not testify. Of relevance to this appeal, Jones made two primary arguments: First, the government did not meet its burden of showing that Jones consented to the search of his motel room; second, any arguable consent was tainted by an impermissible seizure. Jones did not argue, however, that the officers' presentation of the arrest warrant for Gosnell constituted a seizure. In his reply brief in support of the motion, Jones added that the search under the bed exceeded the scope of any consent.

The magistrate judge made the following factual findings: the officers' testimony was "not contested in any meaningful way at the hearing," and their testimony was "entirely credible"; a minute and a half passed between the first knock on the door and when Jones opened it; Officer Brenneke twice stated they "would like to verify [Gosnell's] not inside"; Jones said "That's fine" and moved away from the door; Officer Romines explained they would look where "a person can hide"; and the door was left open during the search.

Turning to Jones's legal arguments, the magistrate judge recommended that Jones was not seized, that he had consented to the search, and that the search did not exceed the scope of his consent. The magistrate judge recommended that

the officers' knocking did not amount to a seizure. The magistrate judge also found Jones had consented to the search by affirmatively stating "That's fine" and stepping away from the door. The magistrate noted: "it is unclear if the officers explained to Defendant that he had the right to refuse to cooperate," but concluded the officers' conversational tone of voice, lack of force, and minimal number of requests to enter (twice) suggested Jones's consent was not coerced. Finally, the magistrate judge recommended that the search was within the scope of consent because "a reasonable person would likely consider the space [under the bed] within the scope of where a person may hide."

Jones specifically objected to the following findings: (1) that no seizure occurred when the officers spoke with Jones at the door, (2) that Jones consented to the search of his motel room, (3) that Jones's consent was voluntary, (4) that a reasonable person would consider the space under the motel bed as within the scope of "where a person may hide," (5) that the officers did not exceed the scope of Jones's consent, and (6) that the search of the motel room did not violate his constitutional rights.

### 2. *The District Court's Opinion*

The district court adopted the magistrate judge's recommendation and denied the motion to suppress. The court observed that 28 U.S.C. § 636(b)(1) requires the court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Although the district court did not discuss each of Jones's objections explicitly, it did adopt the magistrate judge's factual findings, concluding "they aren't in dispute and are otherwise supported by the record."

Regarding Jones's objection to the conclusion that he was not seized, the district court observed that Jones "develops no sound basis for finding [that conclusion] erroneous." Similarly, the court concluded Jones "offers no compelling argument to show the recommendation" that he consented to the search was "erroneous." The district court agreed with the magistrate judge that Jones expressly and voluntarily consented to such a search. The court believed Jones's "real objection" was to the scope of the search, and the court again concluded the magistrate judge's finding on this front "hasn't been shown erroneous." Like the magistrate judge, the district court concluded, "While the space underneath the bed would have been a tight squeeze, it is not unreasonable to believe a person, especially one of petite build, might be hiding under the bed." The district court interpreted Jones's remark that Gosnell "couldn't be under" the second bed not as a withdrawal of consent but as a recognition of the scope of his initial consent.

## II. Discussion

When reviewing a district court's denial of a motion to suppress, we review the court's legal conclusions de novo and its factual findings for clear error. *United States v. Jackson*, 962 F.3d 353, 357 (7th Cir. 2020). Jones raises four issues on appeal: First, whether the district court erred by concluding he was not seized prior to any arguable consent to search his motel room; second, whether the district court erred in concluding that he voluntarily consented to such a search; third, whether the district court erred in concluding that looking under a bed was within the scope of Jones's arguable consent; and fourth, whether the district court correctly applied a de novo

standard of review to the magistrate judge's report and recommendation. We address each argument in turn.

## A. Seizure

The Fourth Amendment prohibits "unreasonable" seizures. U.S. Const. amend. IV. Whether a seizure occurred is a legal determination that we review de novo. *United States v. Tyler*, 512 F.3d 405, 409 (7th Cir. 2008) (citing *Ornelas v. United States*, 517 U.S. 690, 697 (1996)); *see also United States v. Wilson*, 963 F.3d 701, 703 (7th Cir. 2020). Seizures of a person fall into one of two categories: the application of "physical force" or "*submission* to the assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (emphasis in original). The latter is at issue here and "involves either voluntary submission to a show of authority or the termination of freedom of movement." *Torres v. Madrid*, 141 S. Ct. 989, 1001 (2021).

Generally, "officers may approach a willing person in a public place and ask that person questions without violating the Fourth Amendment." *United States v. Adeyeye*, 359 F.3d 457, 461 (7th Cir. 2004). If the encounter occurs in a public place, courts ask whether a reasonable person would have felt "free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). But if police approach an individual in a confined space, such as a bus, the proper inquiry is "whether a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436 (1991). Either way, courts should consider the totality of the circumstances, including where the interaction took place, how many officers were present, the extent to which the police presence was threatening, whether the officers made any show of weapons or physical force, the officers' language and tone, whether the officers suggested that the

defendant was suspected of a crime, and whether the officers told the defendant he was free to leave. *United States v. Holly*, 940 F.3d 995, 1000 (7th Cir. 2019).

Here, the parties agree that *Florida v. Bostick* sets out the proper test for whether a seizure occurred. In other words, the relevant inquiry is whether a reasonable person in Jones's situation would have felt free to decline the officers' request to open the door to his motel room. Jones argues he was seized either when he opened the door or when the officers showed him the arrest warrant for Gosnell. If he is correct, an unreasonable seizure could taint his subsequent consent and require suppression of the gun. *See, e.g.*, *United States v. Lopez*, 907 F.3d 472, 487 (7th Cir. 2018) (concluding that improperly detained suspect's consent to search was not voluntary and reversing denial of motion to suppress).

### 1. *Knocking on Jones's Door*

In arguing the officers seized him by the time he opened the door,[1] Jones relies primarily on *United States v. Jerez*, 108 F.3d 684 (7th Cir. 1997). In *Jerez*, two officers were on drug interdiction duty when they observed a car with an out-of-state license plate parked at a motel near the Milwaukee airport. Around 11 p.m., they returned to the motel, hoping to obtain consent to search the driver's motel room. The officers took turns knocking on the door for approximately three minutes and announced themselves as police officers.

---

[1] Jones concedes that officers have an "implicit license" to knock on someone's front door. *Florida v. Jardines*, 569 U.S. 1, 8 (2013) ("This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.").

Hearing no response, one officer decided to knock on the window of the motel room, while the other continued knocking on the door. The officer by the window shone a flashlight into the motel room and spotted Jerez. This continued for approximately a minute and a half until another man in the motel room opened the door, clad only in his underwear. The court concluded the two men were seized by the time one of the officers began knocking on the window. *Id*. at 690–93. "The deputies' persistence, in the face of the refusal to admit, transformed what began as an attempt to engage in a consensual encounter into an investigatory stop." *Id*. at 692.

The government contends this case is more like *Adeyeye* than *Jerez*. In *Adeyeye*, customs agents suspected a foreign national who had flown to Chicago earlier that day was a drug smuggler. The agents used a "knock and talk" procedure to gain entry into the defendant's motel room. More specifically, they knocked while identifying themselves as police, heard muffled sounds inside the room, and tried knocking again several minutes later. The agents also announced they would come back later if it was an inconvenient time. The defendant opened the door, agreed they could come in, and consented to the search of his belongings. The court distinguished *Jerez* as involving a "substantially more intrusive" encounter and concluded Adeyeye was not seized because the officers knocked only twice and stated they could return at a later time. *Adeyeye*, 359 F.3d at 461–62. A reasonable person, in the court's view, would have felt free to decline the officers' request. *Id*. at 462.

We agree Jones was not seized when Officers Brenneke and Romines knocked on his motel room door. Here, the time between when the officers first knocked and when Jones

opened the door was at most a minute and a half. The officers also sought entry to Jones's motel room slightly earlier in the evening than in *Jerez* (9 p.m., rather than 11 p.m.). While this factor is not dispositive, the brief period of knocking suggests Jones was not roused from sleep as in *Jerez*. Furthermore, the officers spoke in a conversational, nonthreatening tone. Jones's response, "She's not here," in reference to Gosnell, is telling. Jones recognized why the officers were there and did not believe the officers were there for him. Jones even requested and received additional time before opening the door. In light of the totality of the circumstances, the district court properly concluded that a reasonable person in Jones's position would have felt free to decline the officers' request to open the door.

### 2. *The Arrest Warrant for a Third Party*

For the first time on appeal, Jones argues the encounter ripened into a seizure when the officers "flashed" the arrest warrant for Gosnell after Jones opened the door. He emphasizes that the officers showed him the warrant for a mere "15 to 20 seconds," which is a "woefully insufficient time for anyone to read and understand a warrant." In his briefing in support of the motion to suppress, Jones argued only that he was seized by the knocking and the lateness of the hour, not that the warrant itself contributed to the seizure.

Jones nonetheless contends that he preserved the argument that the arrest warrant contributed to a seizure. His arguments are unpersuasive. First, he objected only to the magistrate judge's finding that "no seizure occurred when the officers spoke with [Jones] at the door." Second, although his suppression motion briefing discussed *Jerez*, that case did not involve the display of a warrant; the court's conclusion that a

seizure occurred turned on the lateness of the hour and the prolonged knocking on both the door and the window. Finally, Jones fails to cite a case in which an appellate court considered the presence of a warrant notwithstanding a defendant's failure to raise the issue below. Because Jones forfeited this argument, our review is for plain error. *See United States v. Julius*, 14 F.4th 752, 755 (7th Cir. 2021). To prevail on plain error review, Jones must show (1) an error, (2) that was plain, (3) that affected his substantial rights, and (4) that seriously affected the fairness, integrity, or public reputation of the proceedings. *Id*.

Jones has failed to show any error, let alone plain error. The officers sought entrance to the room based on Jones's consent, not on the grounds that they were executing a warrant. There is no evidence that Jones relied on the warrant before saying, "That's fine" and stepping away from the door. *See, e.g.*, *United States v. Williams*, 931 F.3d 570, 573 (7th Cir. 2019) ("It is the appellant's burden [on plain-error review] to show that an error *actually* occurred, not merely that an error *might* have occurred."). Jones does not dispute that the officers said, "We're not here for you," and that he replied, "She's not here," before he even opened the door. This exchange indicates that he understood the difference between a search warrant and an arrest warrant, and he felt free to decline the officers' requests.

In short, Jones has not shown that he was seized prior to the search.

**B. Voluntariness of Consent to Search**

Consent is a well-recognized exception to the Fourth Amendment's warrant requirement. *Schneckloth v.*

*Bustamonte*, 412 U.S. 218, 219 (1973). Whether consent was voluntary is a factual determination reviewed for clear error. *United States v. Thompson*, 842 F.3d 1002, 1009 (7th Cir. 2016). To assess the voluntariness of consent, we consider the totality of the circumstances. *United States v. Thurman*, 889 F.3d 356, 367 (7th Cir. 2018) (citing *Bustamonte*, 412 U.S. at 227). This court considers: "(1) the age, education, and intelligence of the defendant; (2) whether he was advised of his constitutional rights; (3) how long he was detained before consenting; (4) whether he consented immediately or was prompted by repeated requests; (5) whether physical coercion was used; and (6) whether he was in custody when he consented." *Id*. We have also considered an individual's "experience with the criminal justice system." *United States v. Clinton*, 591 F.3d 968, 972 (7th Cir. 2010). No single factor controls. *Thompson*, 842 F.3d at 1010 (citing *Bustamonte*, 412 U.S. at 226).

### 1. *Jones's Consent Was Voluntary*

The prosecution bears the burden of proving that consent was "freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). To recap, the officers asked Jones to open the door to his motel room, using conversational tones throughout the encounter. When Jones opened the door, the officers explained that they were looking for Gosnell and would like to "verify" that she was not inside. Jones responded, "That's fine" and stepped away from the door.

Based on these facts, the government has easily satisfied its burden of proving that Jones voluntarily consented. The government notes Jones had a GED and extensive interactions with the criminal justice system, suggesting he understood he could refuse consent. While the government contends "the record is unclear" as to whether the officers informed Jones of

his right to refuse consent, it is more accurate to say that the suppression hearing transcript is completely silent on this point. That said, it is undisputed that the officers did not use or threaten the use of physical force, spoke in conversational tones, and asked to "verify" Gosnell was not there only twice.

Jones's counterarguments consist primarily of things the officers could have done but did not do in this case. For example, he suggests the officers should have informed him of his right to refuse consent, explained the difference between an arrest warrant and a search warrant, and retrieved consent forms from their vehicle. This line of argument is squarely foreclosed by *Bustamonte*, which clarified that officers are not required to inform individuals of their right to refuse consent and that consent need not be in writing. *Bustamonte*, 412 U.S. at 227 ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent."). It does not matter that officers sometimes use consent forms or go into greater detail about an individual's rights.[2]

---

[2] *See, e.g.*, *United States v. Rojas*, 783 F.2d 105, 107–10 (7th Cir. 1986) (officers obtained verbal and written consent, in English and Spanish, to search arrestee's apartment); *United States v. LaGrone*, 43 F.3d 332, 333–34 (7th Cir. 1994) (officer read consent-to-search form aloud and defendant-arrestee initialed each line before signing the form). Notably, in both cases, officers sought the defendants' consent to search *after* they had been arrested. Because whether a person is in custody and the length of detention are relevant factors in the consent analysis, it makes sense that the officers in *Rojas* and *LaGrone* went to additional lengths to verify the voluntariness of the defendants' consent.

The district court did not clearly err in finding Jones voluntarily consented to a search of his motel room.

### 2.  *Effect of the Arrest Warrant on Consent to Search*

Jones argues on appeal that the officers' presentation of the arrest warrant for Gosnell rendered his consent to search involuntary. Jones contends that he merely acquiesced to a show of governmental authority when he said, "That's fine" and stepped away from the door. Much like his argument that the arrest warrant caused the encounter to ripen into a seizure, Jones's argument that the warrant vitiated his consent is forfeited. His attempt to characterize this argument as preserved is unpersuasive. The mere use of pinpoint citations in Jones's objections to the magistrate's report does not convey an objection to the magistrate's lack of findings on the role of the warrant. Our review is therefore for plain error. For the same reasons that Jones's consent was voluntary, we further conclude that there was no plain error regarding the effect of the arrest warrant on Jones's consent.

Even if Jones did not forfeit his arguments based on the presence of the warrant, the cases upon which he relies are distinguishable. In *Bumper*, officers approached the home of a suspect who lived with his grandmother and told the grandmother they had a warrant to search the house. The grandmother replied, "Go ahead" and opened the door, but there was no evidence regarding the validity of the warrant itself, which was not produced at the suppression hearing. *Bumper*, 391 U.S. at 546, 550 n.15. The Supreme Court held that a consent search is improper when consent is given "only after the official conducting the search has asserted that he possesses a warrant." *Id.* at 548. In other words, the prosecution failed to show the grandmother's consent was voluntary by pointing

only to "acquiescence to a claim of lawful authority." *Id*. at 549.

In *United States v. Nafzger*, 965 F.2d 213 (7th Cir. 1992), officers went to a farm in Wisconsin to execute a search warrant for a stolen truck. The warrant did not specify a place to be searched other than "the Western District of Wisconsin." *Id*. at 214. Officers showed Nafzger the search warrant, and he told them he had a truck fitting that description. He then led the officers to a shed where the truck was, at which point the officers read him an FBI consent-to-search document. Nafzger read and signed the form, and the officers searched the truck. This court held that, because the warrant failed to identify Nafzger's farm with particularity, the warrant was defective. *Id*. at 216. Applying *Bumper*, any consent pursuant to the warrant was not voluntary. *Id*. at 217 ("This was acquiescence to the claim of authority invoked by flashing the search warrant, not voluntary consent."). The court noted that Nafzger, "a dairy farmer with no criminal record, could not be expected to distinguish between a search warrant *of* the truck and a search warrant *for* the truck." *Id*. at 216–17 (emphasis added).

*Bumper* and *Nafzger* are distinguishable from this case because both involved searches pursuant to a warrant. The circumstances preceding the defendants' "consent" in those cases seriously undermined whether their consents were voluntary. Here, by contrast, the officers merely informed Jones that they had an arrest warrant for Gosnell, but their request to *search* the room was still optional. The district court's finding that Jones voluntarily consented was not clearly erroneous.

Jones's fallback argument, that this court should remand for further factfinding on the warrant, is also unpersuasive.

The record is unclear regarding what role, if any, the warrant played in Jones's decision to allow the officers inside the motel room. But the reason the record is unclear is that the government relied on consent as the basis for the search, and Jones did not argue below that the presence of the warrant rendered his consent involuntary. No additional factfinding is necessary.[3]

## C. Scope of Consent

Whether a search exceeded the scope of consent is a factual finding reviewed for clear error. *United States v. $304,980.00 in U.S. Currency*, 732 F.3d 812, 820 (7th Cir. 2013). The scope of consent is assessed under an "objective reasonableness" standard that asks what a "typical reasonable person" would have understood to be within the scope. *Thurman*, 889 F.3d at 368 (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). The burden is on the individual to limit the scope of consent. *Thurman*, 889 F.3d at 368. Officers may look in any area that could reasonably contain the sought-after item or person. *Jimeno*, 500 U.S. at 252 ("[I]f [an individual's] consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization.").

### 1. No Clear Error

In light of the foregoing conclusion that Jones consented to the search, a reasonable person would likely believe

---

[3] *Cf. United States v. Groves*, 470 F.3d 311, 322–23 (7th Cir. 2006) (remanding for additional factfinding on whether third party voluntarily consented to search of defendant's apartment, where third party claimed officer threatened to send her child to protective services and to charge her for any contraband in the apartment).

looking underneath the beds in Jones's motel room was well within the scope of his consent. Again, the officers explained they would look only "where a person could be." Jones tries to equate lifting the bed with a "physical intrusion," but it seems perfectly reasonable that someone could be hiding under a bed to evade arrest even if it was a tight squeeze. A reasonable person would not consider the officers' assurances that they would not open small drawers as stipulating that they would conduct a strictly visual search. *See United States v. Berke*, 930 F.2d 1219, 1222–23 (7th Cir. 1991) (consent to "look" in a bag reasonably encompassed searching, not just visual inspection).

Jones's reliance on *United States v. Dichiarinte*, 445 F.2d 126 (7th Cir. 1971), does not change this conclusion. There, the defendant consented to a search of his home for narcotics, telling officers to "come over to the house and look, you are welcome to." *Id.* at 128. When it became apparent that the officers were examining his personal papers, Dichiarinte objected, "Does that look like narcotics …?" *Id.* The officers ignored his subsequent attempts to call off the search, and he was later convicted of tax evasion. This court held the search exceeded the scope of his consent, which was limited to narcotics. *Id.* at 129. Here, even if this court were to reach a different conclusion on the scope of consent, the district court's finding was not clearly erroneous.

### 2. *Attempt to Limit the Scope of Consent*

For the first time on appeal, Jones argues he "expressly limited" the scope of his consent when he stated that Gosnell "couldn't be under there" before Officer Brenneke lifted the second bed. Jones did not raise this argument before the magistrate judge or the district court, so our review is for plain

error. *See United States v. Price*, 775 F.3d 828, 835 (7th Cir. 2014).

To determine whether an individual has limited the scope of consent, courts ask whether the consent can "reasonably be understood" to extend to the challenged search. *Jimeno*, 500 U.S. at 252. "If a suspect's attempt to withdraw consent is equivocal, 'police officers may reasonably continue their search in the premises entered pursuant to the initial grant of authority.'" *$304,980.00 in U.S. Currency*, 732 F.3d at 820 (quoting *United States v. McMullin*, 576 F.3d 810, 815 (8th Cir. 2009)).[4] Again, the burden is on the subject of the search to limit the scope of consent. *Thurman*, 889 F.3d at 368.

Any error in the district court's lack of findings about the limiting effect of Jones's statement was not plain. A reasonable observer might have interpreted Jones's comment as an attempt to limit his consent, but an equally logical interpretation is that he was dismissing the possibility the officers would find Gosnell under the bed. Jones has not satisfied his burden of showing the scope of consent did not include looking under the bed. *Id.*

---

[4] As Jones observes in his reply brief, this court has not explicitly required that limits on consent be "unequivocal," as the Eighth Circuit has. This court in *$304,980.00 in U.S. Currency* went on to say, "While our cases have not explicitly required as much, they are consistent with this approach." 732 F.3d at 820. We read this favorable citation of Eighth Circuit case law as endorsing the notion that consenters should clearly indicate the scope or withdrawal of consent. *See id.* ("Put another way, police officers do not act unreasonably by failing to halt their search every time a consenting suspect equivocates.").

### D. De Novo Review of the Magistrate Judge's Report and Recommendation

Under 28 U.S.C. § 636(b)(1), the district court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." A district court judge may fulfill this obligation simply by "inform[ing] [this court] that he has conducted a *de novo* review." *Pinkston v. Madry*, 440 F.3d 879, 894 (7th Cir. 2006). Indeed, in some cases, a district court may even adopt the magistrate's report and recommendation in its entirety without writing its own opinion. *See United States v. Rodriguez*, 888 F.2d 519, 521–22 (7th Cir. 1989).

Here, the district court said it conducted a "de novo review," cited to 28 U.S.C. § 636(b)(1), and independently discussed the relevant law. Jones takes issue with the district court's use of the term "erroneous," which supposedly indicates the district court incorrectly applied the clearly erroneous standard to the magistrate judge's findings. He also argues the court shifted the burden of proving consent from the government to Jones. In context, the district court simply used the term "erroneous" in response to Jones's objections to the report and recommendation. Nothing suggests the district court failed to properly apply the de novo standard of review to each of the magistrate judge's proposed findings and recommendations.

### III. Conclusion

The district court's denial of the motion to suppress is

AFFIRMED.