In the

# United States Court of Appeals
## For the Seventh Circuit

No. 24-3051

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAISON L. COLEMAN,

*Defendant-Appellant.*

Appeal from the United States District Court for
the Western District of Wisconsin.
No. 3:24-cr-00012-wmc-1 — **William M. Conley,** *Judge.*

ARGUED SEPTEMBER 9, 2025 — DECIDED OCTOBER 7, 2025

Before ROVNER, HAMILTON, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge*. Responding to 911 calls of domestic violence is one of the most difficult responsibilities of police officers. This case is a good example. Just after 4:00 a.m. on April 20, 2023, Officer Jamie Kizer of the Marshfield, Wisconsin police department, responded to a caller reporting that her stepfather (Jaison Coleman) threatened to kill her mother (Lisa Coleman) and was still inside the home. Officer Kizer knocked on the door and spoke to Lisa, who balked when

asked whether her kids were okay. Officer Kizer reacted by saying, "I'm sensing that we almost need to come inside to make sure of that." Lisa then said, "Okay" and proceeded to tell Officer Kizer that her kids were in one bedroom, her husband was in another, and her dogs were friendly and would not bite. The district court found that this exchange supplied Officer Kizer with the consent necessary to enter the home and, further, that he and his colleagues did not exceed the scope of Lisa's consent once inside. The district court, therefore, did not suppress the firearms ultimately found in the home. We agree and affirm Jaison Coleman's conviction for unlawful possession of a firearm.

## I

### A

The pertinent facts come from body camera footage recorded by Officer Kizer and his colleagues at the Coleman home. See *United States v. Norville*, 43 F.4th 680, 682 (7th Cir. 2022) ("[A] video record of the events at issue can evaporate any factual dispute that would otherwise exist …." (citing *Scott v. Harris*, 550 U.S. 372, 381 (2007))).

Upon arriving, Officer Kizer knocked on the door and announced himself. Lisa responded by stepping onto the porch and telling Officer Kizer that her son and daughter were inside. She hesitated to answer whether her kids were safe, saying (at that initial moment) only that they were in her bedroom. Officer Kizer then tried again, asking if her kids were going to be okay. Lisa again waffled, this time saying that she "hope[d] so." Taking a different approach, Officer Kizer next asked where her husband was located inside the home. When Lisa responded that she did not know, Officer Kizer asked if

he could enter. Lisa, who had just turned back to the door, paused before saying, "um … I'd prefer you not."

A break in the conversation followed, with Lisa then telling Officer Kizer that she needed to go inside to get her shoes. After some time passed with no sign of Lisa coming back outside, a concerned Officer Kizer cracked the door and called into the house several times asking if she was okay. A minute or so later, Lisa returned to the doorway and again stepped outside, prompting Officer Kizer to ask anew how things were going inside and, even more specifically, the name of her husband—who Officer Kizer understood had threatened her. Lisa responded that it was Jaison, whom we refer to as Coleman from here forward.

A key exchange then followed. When Officer Kizer asked if Coleman was "more calm right now" and, in turn, if the kids were okay, the following dialogue occurred:

> Lisa: I … I … I don't … They're … They're okay right this second … [unintelligible].
>
> Officer Kizer: Okay, um, I'm sensing that we almost need to come inside to make sure of that.
>
> Lisa: Okay.
>
> Officer Kizer: Okay, um ….
>
> Lisa: They're in my bedroom.
>
> Officer Kizer: Are we gonna get bit by dogs if we come in or are they like ….
>
> Lisa: You shouldn't, they're just gonna jump all over you.
>
> Officer Kizer: Okay.

> Lisa: They're not gonna bite.
>
> Officer Kizer: Okay. Alright, where do you think [Coleman] is right now?
>
> Lisa: I'm pretty sure he's in the back bedroom.
>
> Officer Kizer: Okay, alright.

Lisa then opened the door for Officer Kizer and his colleagues and facilitated their entry by brushing her dogs away. She led the officers to one of the back bedrooms and pointed out where the kids were. Not seeing Coleman, Officer Kizer asked where he was, and Lisa responded that she did not know. A quick canvas of the home resulted in Officer Kizer finding him in a separate bedroom. A brief discussion followed, with Coleman permitting Officer Kizer to conduct a protective pat down.

In talking to the two children, the officers learned that Lisa and Coleman had been fighting, with Coleman reportedly being loud, aggressive, and mean. The children added that their father pointed a gun at their mother and threatened to shoot her and to light the house on fire. In response to questions, the children confirmed they saw the gun, both that night and before, but did not know where it was at that moment.

## B

Based on information gained following their entry into the house, the officers sought and secured a warrant to search the Coleman home. The search turned up several guns, leading in time to a federal indictment charging Coleman with possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

Coleman moved to suppress the recovery of the firearms from his home, contending that his wife never consented to Officer Kizer and his colleagues entering in the first instance. Following a hearing, a magistrate judge issued a report finding that Lisa did consent to the officers entering her home and recommending the denial of Coleman's motion. The district court agreed, adopting the magistrate judge's finding that Lisa consented to the officers' entry and, separately, rejecting Coleman's contention that the officers' activity inside the home exceeded the scope of his wife's consent.

Following the district court's denial of his motion to suppress, Coleman chose to plead guilty while reserving his right on appeal to challenge the suppression ruling. That appeal is now before us.

## II

### A

The governing legal principles are well-established, with both parties recognizing that consent is an exception to the Fourth Amendment's warrant requirement for searching a home. See *United States v. Banks*, 60 F.4th 386, 390 (7th Cir. 2023); see also *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). So too do both sides agree that consent need not come from the defendant: "[a] third party may give consent to search a place in which both she and the defendant have legitimate expectations of privacy, and the defendant can challenge the validity of the consent given by the third party." *United States v. Cellitti*, 387 F.3d 618, 621 (7th Cir. 2004) (citing *United States v. Matlock*, 415 U.S. 164 (1974)).

The Supreme Court has long recognized that, for consent to be valid, it must be "freely and voluntarily" given. *Bumper*

*v. North Carolina*, 391 U.S. 543, 548 (1968). Our case law echoes the same standard. See, *e.g.*, *United States v. Jones*, 22 F.4th 667, 676–77 (7th Cir. 2022) (citing and applying the standard announced in *Bumper*).

Courts assess the voluntariness of consent by considering the totality of the circumstances. See *United States v. Han*, 105 F.4th 986, 991 (7th Cir. 2024). Pertinent factors often include, but are not limited to, "(1) the person's age, intelligence, and education; (2) whether he was advised of his constitutional rights; (3) how long he was detained before he gave his consent; (4) whether his consent was immediate, or was prompted by repeated requests by the authorities; (5) whether any physical coercion was used; and (6) whether the individual was in police custody when he gave his consent." *United States v. Figueroa-Espana*, 511 F.3d 696, 705 (7th Cir. 2007) (citing *United States v. Santiago*, 428 F.3d 699, 704–05 (7th Cir. 2005)).

Even with voluntary consent, the subsequent search must respect "the scope of consent." *United States v. Saucedo*, 688 F.3d 863, 865 (7th Cir. 2012) (citing *United States v. Jackson*, 598 F.3d 340, 348 (7th Cir. 2010)). The proper inquiry for evaluating the scope of consent is "objective reasonableness," with courts asking, "what would the typical reasonable person have understood by the exchange between the officer" and the person giving consent? *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (cleaned up).

As a court of review, our role is more limited. We review a district court's finding of voluntary consent and any challenge to its scope for clear error. See *Jones*, 22 F.4th at 675 (citations omitted).

B

Having viewed the complete interaction between Officer Kizer and Lisa, we see no clear error in the district court's finding that she consented to the police officers entering her home. Two aspects of the interaction stand out. First, Officer Kizer's tone and demeanor throughout was that of someone concerned, not someone coercing. Second, Lisa showed that she had the ability to deny consent to entry, as she did just that in response to Officer Kizer's initial request. She chose to let Officer Kizer enter after he asked again, with the second request being unaccompanied by any coercion.

These observations are clear from the video footage. From the time Officer Kizer arrived at the Coleman residence, he spoke calmly and respectfully to Lisa, who—at all points in time—responded in ways demonstrating she understood what was transpiring. While Officer Kizer did not explicitly tell her that she did not need to consent to his entry, the fact that he asked for permission implied as much, as did the fact that she initially denied his request. At no point was Lisa in custody. And while Officer Kizer did ask twice for permission to enter, their entire conversation lasted but a few minutes. While Lisa may have felt some degree of pressure to let the police enter her home, at no point did Officer Kizer exert coercion. On this record, the district court committed no clear error in finding that Lisa consented to the police entry.

Coleman begs to differ, focusing on Officer Kizer's use of the word "need" in the critical second exchange: "Okay, um, I'm sensing that we almost need to come inside to make sure [the kids are okay]." While a plenty fair argument, Coleman's focus is too narrow. The district court could reasonably find that Officer Kizer's use of the word "need" did not make his

request coercive in light of the totality of the circumstances. See *United States v. Hicks*, 539 F.3d 566, 570–71 (7th Cir. 2008). Officer Kizer asked for permission to enter by expressing concern for the safety of Lisa's children and relayed that concern with some urgency and intensity, but the district court did not clearly err by finding that he did so without overstepping and coercing her consent.

Lisa's response all but confirms she heard Officer Kizer's request just that way. After responding "Okay," Lisa told Officer Kizer where the children were inside the home while also assuring him and the other officers present that her dogs may jump on them but would not bite. All of this leads us to affirm the district court's finding that Lisa consented to the police entering her home.

We likewise agree with the district court's finding that the officers acted within the scope of Lisa's consent upon their entry into the home. Their stated purpose was to check the welfare of her children inside, including by confirming that Coleman presented no danger to them or anyone else. Doing so necessarily required the police to scan the home, locate everyone, and ask some basic questions. The information the police acquired led to their securing a warrant to search the home and recovering three firearms. We see no infirmity in the district court's finding that the officers, once inside the Coleman home, respected the consent that Lisa conferred in the first instance.

These conclusions eliminate any need to consider the government's alternative contention that the doctrines of exigent circumstances and inevitable discovery also supported the police's entry into and initial sweep of the Coleman residence.

In the end, then, we AFFIRM. And we do so with a closing and overarching observation: Officer Kizer and his colleagues exhibited sound and balanced decision making in delicate and difficult circumstances.